CASA MARIE, INC., et al., Plaintiffs,

v.

**SUPERIOR COURT OF PUERTO RICO FOR the DISTRICT OF ARECIBO, the Honorable Judge Angel Almodovar in His Official Capacity, Maria Ramos, Raymond Roldan, Carmen Roldan, Myrna Agosto, Juan Valenzuela, Demetrio Rubio, Esther Rivera Santos, Adelaida Alcantara, Orlando Gutierrez, Nilsa E. Rios, Angel Morales, Wadi Blanco, Angeles–Almenas, Héctor Rodriguez, Aixa Ortiz, Modesto Rivera, Carmen Montalvo, Candida Lopez, Each in Their Individual Capacity and as Representatives of the Conjugal Partnerships They Have Constituted With Their Respective Spouses, Defendants,**

**Puerto Rico Legal Services, Intervening Plaintiff.**

**Civ. No. 90–2435 (JAF).**

United States District Court, D. Puerto Rico.

Nov. 15, 1990.

Nora Vargas–Acosta, Vargas & Ramirez, San Juan, P.R., for plaintiffs.

Juan F. Correa–Luna, San Juan, P.R., Carlos Vega–Pérez, Arecibo, P.R., for intervening plaintiff.

Angel M. Bonnet–Rosario, Arecibo, P.R., Ramón L. Walker–Merino, San Juan, P.R., for defendants.

Antonio Fiol–Matta, San Juan, P.R., Carlos E. Rodríguez–Quesada, Director, Federal Litigation Div., Dept. of Justice, Comm. of Puerto Rico, Héctor Rivera–Cruz, Secretary of Justice, for codefendant Superior Court of Arecibo.

## OPINION AND ORDER

FUSTE, District Judge.

Casa Marie, Hogar Geriátrico, Inc. ("Casa Marie") is a live-in elder-care facility currently home to approximately thirty-five elderly, mostly handicapped persons. Some neighbors in the residential area in which it is located want it to cease functioning. The neighbors sought and obtained a state court judgment ordering the owners to close the home, ostensibly on grounds that operation of the home violated a restrictive covenant [1] forbidding this particular use and also because of the failure of the owners to obtain a use variance under the building code for modifications to the structures that house Casa Marie. On

---

1. The kind of restrictive covenant here is referred to in civil law as a "servidumbre de equidad." Such a restriction on the right of property has been recognized by the Supreme Court of Puerto Rico in *Asoc. de Vecinos de*

*Villa Caparra v. Iglesia Católica*, —— D.P.R. ——, 86 J.T.S. 43 (1986); *Sands v. Extensión Sagrado Corazón, Inc.*, 103 D.P.R. 826 (1975); and *Colón v. San Patricio Corp.*, 81 D.P.R. 242 (1959).

the owners' failure to shut down, a contempt order threatening incarceration of the owners issued in the state court. Now a group of the elderly handicapped residents, precluded by the state court from taking part in those proceedings, joins with the owners as plaintiffs here to stop the enforcement of the state judgment. The elders allege that they are being discriminated against for being handicapped elderly, in violation of the Fair Housing Act (FHA) and the Equal Protection Clause. They seek injunctive relief and damages under the FHA and 42 U.S.C. section 1983. We face five basic issues: 1) whether this action is barred by *res judicata;* 2) whether we should exercise abstention in the interest of comity; 3) whether state action occurred here; 4) whether the substantive constitutional and statutory violations complained of in fact occurred, and 5) whether we have the power in light of the Anti-Injunction statute to grant the desired injunction. After careful consideration of the difficult state-federal relations involved here, we hold that an injunction against the enforcement of the state court judgment is proper.

## I. *Background*

On October 26, 1990 a Verified Complaint and Petition for a Temporary Restraining Order and other injunctive relief were filed by plaintiffs Casa Marie; nine handicapped citizens of Puerto Rico who range in age from 75 to 93 years old and who reside at Casa Marie; Maria Plá and her husband Francisco Monrouzeau, the corporate directors and managers of Casa Marie; Victor Plá and his wife Damaris Rodríguez, the owners of two of the three properties constituting Casa Marie; and the Committee of Relatives and Friends of Casa Marie ("Committee"), an association organized to advocate and assist the residents of Casa Marie. Also, pursuant to Fed.R.Civ.P. 24(a)(2), the court later granted the motion of the Legal Services Corporation of Puerto Rico ("Legal Services") to intervene on behalf of five additional residents of Casa Marie. Plaintiffs alleged violations of the Fair Housing Act, 42 U.S.C. §§ 3601–3631,

as well as 42 U.S.C. section 1983 and the fourteenth amendment of the United States Constitution. They sought to enjoin defendants, who are homeowners and neighbors of plaintiffs in the Jardines de Arecibo housing development, from taking any further affirmative action to have the handicapped residents removed from Casa Marie and the institution cease operations.

Because of the seriousness of plaintiffs' allegations, and the concern that elderly, handicapped citizens might be left homeless, we granted the Temporary Restraining Order. We requested the Superior Court of Puerto Rico, Arecibo Part, to stay the execution of its civil contempt judgment, which would have resulted in the incarceration on November 5, 1990 of the owners and operator of Casa Marie, and a *de facto* closing of the home, until this court could conduct a hearing as to the alleged federal violations. Jurisdiction is based on 28 U.S.C. section 1331 and 42 U.S.C. section 3613(a).

## II. *Factual Determinations*

Beginning on November 5, 1990, the court conducted a four-day hearing on this matter. Fourteen witnesses were called by plaintiffs and three additional witnesses, all government officials, were called, *sua sponte*, by the court. Fed.R.Evid. 614(a). Documentary evidence was submitted by both sides. On November 8, 1990, this judge, in the presence of counsel, made an on-site inspection of Casa Marie and the surrounding neighborhood. Based on all of the evidence received, we make the following determinations of fact:

1. On April 25, 1986, Casa Marie was incorporated as a not-for-profit corporation organized under the laws of Puerto Rico.[2] Maria Plá testified that Casa Marie was founded to provide a permanent home for handicapped, senior citizens. The original president of Casa Marie's board of directors was Victor Plá, Ms. Plá's brother. Mr. Plá, along with serving as chairman, assisted Casa Marie in its incorporation and in other financial matters. Initially, Francisco Monrouzeau, Ms. Plá's husband,

---

2. *See* Plaintiff's Exhibit 8.

served as Casa Marie's administrator. In 1988, Ms. Plá replaced her husband as administrator. Ms. Plá currently serves as president of the board of Casa Marie.

2. Casa Marie is located in the Jardines de Arecibo housing development in Arecibo, Puerto Rico. The three properties which constitute Casa Marie are identified on plot maps as B–I 19, B–I 20, and B–I 21. They are contiguous lots, each abutting the street. The three units are located at the end of a dead-end street described at the hearing as a cul-de-sac. Because the housing development is built on a hill, the properties on the street behind Casa Marie are at least thirty feet above the facility. There are other properties to the east of Casa Marie but no properties to the west or across the cul-de-sac to the north. The facility consists of three individual, single-story structures that were joined together by ground-level ramps, so there could be wheelchair access from one structure to the other. The structures were also joined at the roof. The interiors of the structures were renovated to provide individual bedrooms for the residents, as well as a common dining room, sitting areas, and office space.

The Registry of Property of Arecibo specifies the types of restrictions on land use for properties in the development. The relevant portions state:

A) Land Use: [t]he lot shall [not] be used except for residential purposes. No building shall be erected, altered, placed or permitted to remain on any lot other than one-family detached, semi-detached, or row dwelling not to exceed two stories in height and a private garage for not more than two cars. . . .

. . . .

D) Nuisances: No noxious or offensive activity shall be carried on upon any lot or dwelling, nor shall anything be done therein which may be or may become an annoyance or nuisance to the neighborhood.

. . . .

I) Use Other than Residential: The exceptions to the use of the lots of this development for residential purposes referred to before shall be the following: 1. provisional areas as shown in the plans of Jardines de Arecibo Development for the two parks, the cultural center, church, school, other public uses; being it provided that if and when the Planning Board of Puerto Rico designates the final location of said areas, the said shall be considered excluded from restrictive covenants and the provisional areas hereinbefore mentioned, in total or in part, according to the requirements of the Planning Board, shall be covered by these restrictive covenants unless otherwise herein stated.

. . . .

K) Architectural Control: No building shall be erected, placed, or altered on any lot until the construction plans and specifications and a plan showing the location of the structures has been approved by the Architectural Control Committee as to quality of workmanship and materials; harmony of external design with existing structures, and as to location with respect to topography and finish grade elevation. . . .

*Registro de Propiedad,* Sección I, Arecibo, Finca Número 14,904, pp. 216–221. Under the zoning law of Puerto Rico, this development was zoned as R–3. Uses in R–3 zoning include one or two family homes, row houses ("casas en hilera"), apartment houses, and other uses. *Reglamento de Zonificación de Puerto Rico,* § 9.02 (rev. Jan. 14, 1989) ("Rules"). Among the other uses considered by the Planning Board for a use variance within zoning R–3 are homes for the aged, *Rules,* § 83.05(3). Casa Marie was in the process of obtaining approval for such use.

3. The testimonies of government officials involved in the licensing process, and the documentary evidence submitted into evidence, confirmed Ms. Plá's testimony that Casa Marie, with the exception of the modifications made to and the use of structure B–I 21, followed the normal procedures to obtain the necessary license to

operate a home for the aged.[3] On February 4, 1987, the Department of Social Services ("DSS") granted Casa Marie a provisional license to operate a geriatric facility for seven residents in structures B–I 19 and B–I 20 [4] and specified that the licensing process would be continued so as to determine whether Casa Marie would be eligible for a permanent license. No provisional license was granted for structure B–I 21. Officials from DSS testified that, as a general rule, even when a provisional license of this sort expires after six months and no permanent license is issued, the facility is allowed to continue its operations under the provisional license and supervision of DSS until the permanent permission is issued.[5] Ms. Rosa Canino, Director of the Licensing Division for DSS, testified that it is the agency's policy to allow facilities that do not meet all of the requirements for licensing to continue operations while receiving the assistance of DSS to complete licensing requirements. She further testified that only facilities considered "high risk" will receive more intensive supervision by DSS. She explained that "high risk" facilities are those where there is evidence of neglect and/or abuse in resident care. In these cases, if the deficiencies cannot be remedied, DSS will take the facility to the Superior Court to petition its closing. Ms. Canino also testified that Casa Marie did not fall into the "high risk" category and that if it were allowed to remain open, DSS would

assist the directors to correct deficiencies and comply with the requirements for a permanent license. Part of DSS' assistance is coordinating with the other agencies involved in the licensing process, *i.e.,* A.R.P.E., the Department of Health, and the Fire Department, including interchange at the level of agency heads so that, where possible, these facilities may be granted a license.

The court also heard testimony from Angel Manuel Rodriguez, an engineer from A.R.P.E. who was familiar with the structures of Casa Marie. He confirmed that proper building permits were not issued for B–I 21. Mr. Rodriguez further testified that, in order to legalize the constructions of Casa Marie, the three lots where the buildings are constructed would have to be grouped together to form one property.[6] When asked by the court whether it was possible for Casa Marie, after doing the required renovations, to conform to A.R.P.E.'s regulations, Mr. Rodriguez confirmed that it might be possible but further evaluation of the structures would have to be undertaken. He testified that the agency has not done this evaluation because of the pending state court proceedings.

4. In Casa Marie's case this licensing process was interrupted when defendants filed an action against Casa Marie and the corporate directors in the local court on April 18, 1988 seeking to permanently en-

---

**3.** The Department of Social Services ("DSS") is the agency charged with licensure and supervision of homes for the aged and handicapped. Casa Marie filed a petition for licensure on May 7, 1986. After filing the petition, the facility then sought the endorsements of the Fire and Police Departments, the Department of Health, and the Administración de Reglamentos y Permisos ("A.R.P.E."). After obtaining these endorsements and after several visits by DSS, the latter reported favorably on Casa Marie and recommended the authorization of a provisional license.

**4.** Although the provisional license was granted for both structures, an official from A.R.P.E. in Arecibo testified that the original petition made to A.R.P.E. referred only to structure B–I 19. No explanation was given as to why the endorsement A.R.P.E. gave to DSS mentions both B–I 19 and 20.

**5.** The record thus shows that, as of today, the following endorsements, permits or licenses are in force:
 1) Certification—Environmental Health, Department of Health, Puerto Rico, for structures B–I 19 and B–I 20, dated May 1, 1990.
 2) Use Permit—A.R.P.E., R–3, at least to residence B–I 19, dated May 21, 1986 (*see* footnote 3).
 3) Endorsement—Fire Department, current (*see* footnote 3).
 4) License—Department of Health, License #2104, issued May 1, 1990.
 5) Extended Temporary Permit—Department of Social Services (*see* testimony of Rosa Canino, Director of Licensing, DSS, Commonwealth of Puerto Rico).

**6.** This formality requires the preparation of a deed by a notary public complying with the Puerto Rico Mortgage Law of 1979. 30 L.P.R.A. §§ 918, 919.

join both the renovation and the use of Casa Marie as a home for handicapped elderly.[7] Further, defendants sought an order from the court enjoining A.R.P.E., in the future, from authorizing any use variance for the properties in question. In July of 1989, the Superior Court rendered its decision and found for the neighbors. The court took notice of the parties' stipulations that A.R.P.E. had granted the proper authorizations for the renovations at structures B–I 19 and B–I 20 and that there were forty-five other buildings in the development with zoning violations and or non-conforming uses. The local court found that the renovations and the use of Casa Marie were a nuisance and violated the restrictive covenants of the Jardines de Arecibo development. The court further found that the authorization Casa Marie originally received only pertained to structure B–I 19 and only provided for the care of two or three senior citizens. When faced with evidence that other neighbors had also made renovations without prior A.R.P.E. approval, the court held that those renovations were distinguishable. The neighbors' renovations, according to the court, were done to extend the residential use (of the property) for the benefit of the nuclear family and, though such renovations were in fact violations of A.R.P.E. building regulations, the neighbors' modifications did respect restrictive covenants. The court issued a permanent injunction against Casa Marie, ordered the facility closed, and the illegal structures demolished. By November 14, 1989, the Supreme Court of Puerto Rico had denied Casa Marie's petition for discretionary review of the judgment and of the motion for reconsideration unsuccessfully filed in Arecibo.

The local court held further proceedings to execute the judgment and on October 9, 1990, Superior Court Judge Angel M. Almodóvar found plaintiffs Victor Plá, Maria Plá, and Damaris Rodriguez in contempt and ordered them to comply with the local court's prior judgment by November 5, 1990 or face imprisonment.

In reviewing the court file from the local action, we note that futile attempts were made by elderly residents to intervene in the local court proceedings. Furthermore, Casa Marie and its administrator attempted, although quite late in time, to raise Federal and other state law claims. These were also denied. On September 8, 1989, Casa Marie and its directors filed a brief in support of their petition for review of the Superior Court decision by the Puerto Rico Supreme Court. In the brief, they raised the argument that Puerto Rico Law 121, 8 L.P.R.A. §§ 341–347, a Bill of Rights For the Elderly, had been violated. They also made the local equivalent of a Fed.R.Civ.P. 60(b) motion on December 18, 1989, where again they raised Puerto Rico Law 121 and discrimination against elderly claims. The Superior Court denied this motion on March 28, 1990. In the local court's minutes of a hearing dated August 15, 1990, the court stated that the local court was not the proper forum for the Casa Marie and its directors to raise a Fair Housing Act claim and noted in addition that the judgment was final.

On October 2, 1990, the elderly themselves tried to get into local court. Legal Services filed a motion to intervene in the original action, as well as filing a separate action on behalf of five of Casa Marie's residents. Both the motion and new case went before Judge Almodóvar, who proceeded to recuse himself. The case was reassigned to Judge Bajandas Vélez. A hearing was held on October 23, 1990 before Judge Bajandas. As of today, no ruling has been made on either the elderly's complaint or their motion to intervene in the original case, nor has Judge Almodóvar's order to incarcerate the di-

---

7. In fact, two separate actions were filed against Casa Marie and its operators. The first action, 88–270, prompted by the neighbors' intervention, was a cease and desist order filed by A.R.P.E. to halt the renovations being done on structure B–I 21 because Mr. and Ms. Plá did not obtain the proper construction permit. Defen-

dants here (plaintiffs in the local action) petitioned the court in the second action, 88–615, to consolidate their claims to halt the illegal constructions and to enforce the restrictive covenants with A.R.P.E.'s suit. The Superior Court granted this request.

rectors of Casa Marie been stayed pending the outcome of these parallel local court proceedings.[8] We therefore find that as of late 1989, the spectre of illegal discrimination was brought to the attention of the local court.

5. Casa Marie has continued operations throughout the course of the local litigation with the support of DSS. DSS' interest in preserving elder-care facilities is born of the paucity of the availability of such care in Puerto Rico. Dr. Carmen Sánchez, an expert witness in gerontology and the demographics of aging in Puerto Rico, testified that the elderly population of Puerto Rico is increasing both in percentage and in life expectancy. She testified that, according to United Nations statistics, Puerto Rico is seventh in the world in the number of citizens in the age group of eighty-five and above. This increased number of older senior citizens, in turn, increases the percentage of elderly with chronic handicaps resulting from advanced age. In the inspection visit to Casa Marie, this court witnessed the fact that the majority of residents in Casa Marie pertained to this group of aged with chronic illnesses. Dr. Sánchez also testified that the three greatest problems facing senior citizens on the island are income, health, and housing. Around 75% of the elderly population in Puerto Rico have incomes which fall below the poverty line which necessarily limits their access to services such as housing and health care. Also, as opposed to the situation in the states where Medicaid is available to the indigent elderly for long-term care, Puerto Rico has no entitlement program which would assist the elderly poor in their quest for adequate housing.

Adding to these facts, Dr. Sánchez dramatized the situation of an older (over 75) handicapped senior who has no family living here on the island (or no family at all), has very little income and is in need of long-term care because she can no longer live independently. In such a situation the senior's alternatives are very limited. They can either find someone with whom to live or depend on DSS to place them in some type of health care facility. Also, the increased life expectancy of senior citizens creates situations where the children or other relatives who might be willing to assume the care of the elderly person are themselves senior citizens who cannot, either because of their own health-related or economic limitations, provide the type of residential context which their handicapped parent or relative might need. Dr. Sánchez's statement of this phenomena was confirmed by the testimony of plaintiff Santos Santana, whose ninety-four year old, wheel-chair bound aunt, Josefa Torres, is a resident of Casa Marie. Mr. Santana, sixty years old and a retired teacher, placed Ms. Torres at Casa Marie in 1987 after it became apparent that he could not provide for her care. His aunt has no income and Casa Marie has not received any payment for Ms. Torres in over a year. Casa Marie's closing would present Mr. Santana with the difficult choice of (a) taking Ms. Torres into his home and not providing her with proper care because of her physical condition; (b) hiring nursing staff and paying them from his limited retirement income; or (c) searching for another facility for Ms. Torres and again using his limited income to pay for her care. Other relatives of residents presently living at Casa Marie gave similar testimony. In Dr. Sánchez's opinion more congregate-living alternatives, similar to Casa Marie, need to be developed to meet the needs of this particular population in Puerto Rico.

6. Dr. Sánchez also gave testimony as to the types of myths about the elderly which give rise to discrimination against them. For example, she stated that it is a myth that the elderly do not like to have children around them. This myth in turn develops into policies which end up isolating housing for the elderly from residential areas. Defendant Waddie Blanco, a neighbor who lives on street C behind and above

---

**8.** In paragraph 8 of Legal Services' complaint to the local court, they allege that at the hearing "Judge Bajandas stated, off the record, that although Legal Services [sic] arguments were compelling and just she would not rule in favor of the complaint filed by them because she did not feel comfortable over[r]uling a decree previously made by a judge at the same level as her."

Casa Marie, confirmed Dr. Sánchez's opinion in her testimony. Ms. Blanco first stated that the reason neighbors object to the presence of Casa Marie is that there is a very small play area next to Casa Marie and that children are afraid to play there because they, the children, might disturb the elderly. She then said she was bothered by the elderly screaming since she didn't know why they were screaming and "she couldn't go to them to help them." She then testified that her concern was that the elderly should reside in a "proper" home for the aged, specifically a structure built for that purpose.

Dr. Sánchez pointed to a second motive, the basic human desire to avoid thinking about aging and death, which purports to rationalize policies which result in segregation of the aged. Defendant Adelaida Mañaná, a neighbor who lives six doors down from Casa Marie, testified that, as a medical doctor, she was around the infirm throughout the day and did not want to see them at night. The sight of ambulances and funeral hearses passing by, which she asserted was a daily occurrence, disturbed her peace and tranquility. Upon further inquiry, Dr. Mañaná did admit that a neighbor on the same block owns two ambulances and parks them on the street in the evening. Another defendant, Angeles Almenas, testified that the increased traffic, and especially the increased number of hearses on the block, were, in her mind, a nuisance.

Testimony was also heard from defendants Esther Rivera and Demetrio Rubio, a married couple who do not currently live in the neighborhood, but who are owners of a house in the C-block of Jardines de Arecibo. Ms. Rivera also spoke of the increased volume of ambulances and hearses while her husband testified that the presence of Casa Marie might lessen the value of his property and, although he did not live in the neighborhood at the present, he and his wife planned to return in the future.

7. Finally, plaintiff Joaquin Olavarria, a resident of Casa Marie, testified about his own experience of seeking a decent long-term care facility. Mr. Olavarria, seventy-five years old and confined to a wheelchair because of the loss of a leg, is a widower with one son who lives in New York. He receives a total monthly income of $442. He had lived in three other congregate homes before moving to Casa Marie. He described abusive treatment in these facilities, including having his personal belongings stolen in one case and being told to vacate the premises by the owner in another. He has been at Casa Marie for almost a year. He pays $400 a month at Casa Marie [9] for room, board, laundry, and basic nursing care. He concluded his testimony reminding the court that if Casa Marie is closed he would have to move and was not sure where he would go.

### III. *Jurisdiction*

Defendants have raised several issues in their motion to dismiss which implicate important issues of federalism and comity. This court is well aware that there has been a final judgment by a state court of general jurisdiction against some of the plaintiffs in the present action. We will discuss and rule upon each of defendants' arguments as to why this court should not accept jurisdiction of plaintiffs' claims.

### A. Statute of Limitations

Defendants argue in their Motion to Dismiss and/or for Summary Judgment that plaintiffs' section 1983 claim is time-barred. At the close of the hearing, they made a similar argument as to the Fair Housing Act claim. In terms of the section 1983 claim, they argue that the final decision of the Arecibo Superior Court in July of 1989 constituted the last act of any alleged discrimination on the part of the defendants and the one-year statute of limitations for section 1983 bars this claim. As to the Fair Housing Act claim, defendants argue that the 180-day limitation in effect at the time defendants filed their original action in April of 1988 controls and should

**9.** Throughout the hearing various references were made to the amount residents pay at Casa Marie. It seems the operators charge based on the ability of the seniors to pay. The range seems to be in the $350–$500 per month.

be applied to plaintiffs' claim, thus rendering both actions time-barred.[10] We disagree.

In *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81, 102 S.Ct. 1114, 1125, 71 L.Ed.2d 214 (1982), the United States Supreme Court ruled that

> where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitation period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice.

The Court adopted a "continuing violation" theory and urged that parties and courts avoid a "wooden application" of the statute of limitations provision so as not to undermine "the broad remedial intent of Congress embodied in the Act." 455 U.S. at 380, 102 S.Ct. at 1125. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 417, 88 S.Ct. 2186, 2191, 20 L.Ed.2d 1189 (1968).

With respect to the section 1983 claim, in order to state a "continuing violation", "a complaint must indicate that not only the injury, but the discrimination, is in fact on-going." *Goldman v. Sears, Roebuck & Co.*, 607 F.2d 1014, 1018 (1st Cir.1979); *Velázquez v. Chardón*, 576 F.Supp. 476, 477 (D.P.R.1983). Sufficient facts must be alleged to establish that a valid section 1983 claim does exist. *Dewey v. University of New Hampshire*, 694 F.2d 1, 3 (1st Cir.1982).

Plaintiffs allege that defendants have violated their civil rights by using the state judicial system to exclude plaintiffs from Casa Marie. Each time defendants have sought to use the judicial system for a constitutionally impermissible end, *cf. Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), they have continued to violate plaintiffs' rights. Whether one finds each act of the defendants invoking

the state court's jurisdiction a distinct act or whether one recognizes the broad remedial purpose of the civil rights statutes, including the FHA, to eliminate patterns and practices of discrimination, sufficient facts have been alleged here for us to find a "continuing violation" under both section 1983 and the FHA. Here, plaintiffs are not simply suffering the effects of some past discriminatory act, *De León Otero v. Rubero*, 820 F.2d 18, 19 (1st Cir.1987), but continue to suffer from discriminatory conduct each time defendants go to court with the intention of removing them from Casa Marie. It would be absurd for us to find the action time-barred when the real discriminatory harm, the eventual eviction of the handicapped elderly, has yet to take place. The defendants' attempts to reach that allegedly discriminatory end are in the very real sense of the word "on-going". We therefore *deny* defendants' motion to dismiss based on the statute of limitations.

## B. Res Judicata

■ Defendants next argue that the principle of *res judicata* must be invoked as to the corporate entity Casa Marie, Mr. and Ms. Plá, and their spouses, and that collateral estoppel bars the residents and family members of Casa Marie from relitigating the same issue already decided in the local court. While we agree that the plaintiffs who were parties in the state court action are barred under the principle of *res judicata*, we hold that the residents of Casa Marie are not collaterally estopped from bringing the present claims. The corporate plaintiff, and the owners, then, stay in this action only on the coattails of the elderly residents. This court retains jurisdiction over Casa Marie and the Plás. Though their claims are barred by *res judicata*, they are necessary parties for the disposition of this separate action by the elders.[11]

---

10. The 180–day limitation was extended to two years by the 1988 amendments to the FHA. 42 U.S.C. § 3613(a).

11. Were Casa Marie and its operators not already parties, pursuant to Fed.R.Civ.P. 19(a)(1), a joinder would have been feasible so that the residents of Casa Marie could be accorded complete relief. Because the court finds a violation of the elderly handicapped residents' constitutional and statutory rights, and these parties will be implicated in the affirmative relief to be granted by the court, they remain necessary parties. We acknowledge, however, that as parties seeking affirmative relief from this court,

**1162**

It is clear that a federal district court must give the same preclusive effect to state court judgments as that given in local courts. 28 U.S.C. § 1738; *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). *Allen* also stands for the proposition that the normal *res judicata* rules apply to section 1983 actions. Therefore, Puerto Rico *res judicata* law must be examined in order to determine the preclusive effect which must be given to the state court judgment.

Article 1204 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3343, contains the local *res judicata* provision.[12] Under section 3343, there must be "the most perfect identity of things, causes, and parties of the litigants" in order to give *res judicata* effect to subsequent judgments. *See Futura Development Corp. v. Centex Corp.*, 761 F.2d 33, 42–46 (1st Cir.1985). Also, under Puerto Rico law, *res judicata* will not be given effect if its application would defeat the ends of justice, especially where reasons of public policy are involved. *See Millán v. Caribe Motors Corp.*, 83 P.R.R. 474 (1961); *Pérez v. Banza*, 83 P.R.R. 213 (1961). In the present action we find no identity of parties or causes and also find the "ends of justice" exception applicable.

The residents of Casa Marie and their family members were not parties to the local court proceedings. Therefore, defendants' argument that *their claims* could have been litigated simply has no merit. As the court in *Futura* stated, "[i]dentity of parties and interest is required so that a party's rights and obligations will not be determined without their knowledge or an opportunity for participation." 761 F.2d at 43. Here, we note again the attempts by the elderly handicapped intervenors to make the local court aware of the alleged violations of the residents' federal and state rights. Their interests in not being discriminated against in their right to live where they choose is not "identical" with the directors of Casa Marie, who were the defendants in local court. 761 F.2d at 43–44. In such a situation, there does not exist the identity of parties necessary to require a bar of this action under the principle of *res judicata* under Puerto Rico law.

Also, we do not find the "identity of causes" necessary to invoke the presumption of *res judicata* in Puerto Rico law. In *Lausell Marxuach v. Diaz de Yáñez*, 103 D.P.R. 533, *Official Translations*, Vol. 3 at 746 (1975), the Puerto Rico Supreme Court defines "cause" as "the principal ground, the origin of the actions or exceptions raised and decided, and it must not be mistaken for the means of proof nor for the legal grounds of the claims adduced by the parties." (Citation omitted). In the action before us, the basis of the claims are civil rights violations, while in the local court they were the enforcement of restrictive covenants and construction violations. The differences do not go simply to the grounds or reasons for the actions, *Futura*, 761 F.2d at 45 (quoting *González v. Méndez*, 15 P.R.R. 682 (1898)), but rather to their origin. Before us are plaintiffs who are seeking to be free of discrimination in their choice of residence. The basis

---

these parties are barred by the application of *res judicata.*

**12.** Section 3343 reads as follows:
Sec. 3343. Destruction of presumptions: res judicata
Presumptions established by law may be destroyed by proof to the contrary, except in the case in which it is expressly prohibited.
Only a judgment obtained in a suit for revision shall be effective against the presumption of the truth of the *res adjudicata.*
In order that the presumption of the *res adjudicata* may be valid in another suit, it is necessary that, between the case decided by the sentence and that in which the same is invoked, there be the most perfect identity between the things, causes, and persons of the litigants, and their capacity as such.
In questions relating to the civil status of persons, and in those regarding the validity or nullity of testamentary provisions, the presumption of the *res adjudicata* shall be valid against third persons, even if they should not have litigated.
It is understood that there is identity of persons whenever the litigants of the second suit are legal representatives of those who litigated in the preceding suit, or when they are jointly bound with them or by the relations established by the indivisibility of prestations among those having a right to demand them, or the obligation to satisfy the same.

for the local court action rested in the areas of enforcement of restrictive covenants and violations of the zoning law and building code. *Res judicata* would not apply in this case.

Finally, we also find that, in this case, the "ends of justice" exception would also apply to bar *res judicata* effect to the local court decision. In *Pagán Hernández v. University of Puerto Rico*, 107 D.P.R. 720, *Official Translations*, Vol. 7 at 806–08 (1978), the court quoted earlier Puerto Rico Supreme Court precedent with respect to the standard for the application of this exception to *res judicata* in Puerto Rico.

> [T]he doctrine rests upon the basic principle that there should be an end to litigation, but if the rigid application thereof would in practice defeat a right permeated in some way with public interest, the courts are inclined to a solution which would guarantee proper justice instead of rigidly applying a fiction of law which rests fundamentally upon a principle of convenience and procedural order.... In other words, the rule is not absolute and should always be weighed with the equally salutary principle that justice should be done in every case.

The court in *Pagán Hernández* went on to find that the plaintiff did not waive his Puerto Rico constitutional right to education because he did not invoke it in an administrative proceeding against the university. 107 D.P.R., *Official Translations* at 808. While the court said that it is necessary to inquire into the circumstances in each case, the court stated categorically that "[w]aivers of fundamental rights are never presumed. These should be 'express, never presumed, and voluntary and performed with full consciousness.'" 107 D.P.R., *Official Translations* at 808 (citations omitted).

Examining the circumstances of this case, compelling evidence was presented to this court that the housing situation in Puerto Rico for the handicapped elderly is desperate. Further, Ms. Isabel Soto, an official from the Governor's Office of Elderly Affairs, testified that Puerto Rico Law 121, 8 L.P.R.A. §§ 341–347, provides a Bill of Rights for the elderly and among its provisions are the need to provide adequate housing and health care for the Commonwealth's elderly population. Given these circumstances, the allegations that plaintiffs' federal and state constitutional rights are being violated, and the elderly's rejected attempts to enter the state court, it would certainly defeat the ends of justice to bar the elderly's action by the application of *res judicata*. We therefore *deny* defendants' motion to dismiss the elderly plaintiffs as to the issue of *res judicata*. We *grant* the motion as to Casa Marie and its directors, but retain jurisdiction over them.

### C. Abstention

■ Defendants move this court to abstain from deciding this case based on the various abstention doctrines. *See Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483, *reh'g denied*, 426 U.S. 912, 96 S.Ct. 2239, 48 L.Ed.2d 839 (1976). Defendants, however, argue the *Younger* abstention doctrine and claim that the policies served by *Younger*-type abstentions by the federal courts, *i.e.*, preventing a multiplicity of lawsuits, promoting comity, and waiving the use of the federal court's equitable power where there are adequate remedies at law (presumably in state court proceedings), should be applied in this case. We do not find defendants' arguments persuasive and decline to abstain.

In *Younger*, the explicit holding was that "a federal court should not enjoin a state criminal prosecution begun prior to the institution of the federal suit except in very unusual situations, where necessary to prevent immediate irreparable injury." *Samuels v. Mackell*, 401 U.S. 66, 69, 91 S.Ct. 764, 766, 27 L.Ed.2d 688 (1971) (a companion case to *Younger* where the Court itself formulates the holding of *Younger*). *See* 17A C. Wright, A. Miller, & E. Cooper,

*Federal Practice and Procedure* § 4251 (1988). Both *Younger* and the companion cases decided with it [13] stand for the proposition that federal courts, in the absence of unusual circumstances, cannot interfere with a pending state criminal prosecution. Wright, Miller & Cooper § 4252.

While *Younger* stands for the proposition that pending criminal proceedings cannot be enjoined, we recognize that this principle has been extended to certain types of civil proceedings. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (state action enjoining the theater owner from exhibiting obscene films where owner did not appeal trial court judgment); *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (state court judgment entered against debtor who did not answer subpoena to appear for deposition); *Trainor v. Hernández*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (plaintiff who fraudulently obtained welfare payments brought federal suit challenging attachment procedures after Illinois brought state civil action to recover monies); *Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) (parent who brought federal action where there was a pending state child custody proceeding to determine if child abuse present).

More specifically, the Supreme Court has warned that where a state court's contempt process is involved, federal courts should exercise great restraint before accepting jurisdiction. *Juidice v. Vail*, 430 U.S. 327, 334–36, 97 S.Ct. 1211, 1216–17, 51 L.Ed.2d 376 (1977); *Pennzoil v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). However, the Court does go on in *Juidice* to recognize that abstention is only appropriate where plaintiffs had an opportunity to fully present their federal claims in the state court proceedings. 430 U.S. at 337, 97 S.Ct. at 1218. In *Pennzoil*, the Supreme Court followed *Juidice* and ordered the federal district court to abstain pending the result of Texas state court proceedings. In both *Juidice* and *Pennzoil*, what the court found objectionable was the use of

federal courts to challenge the very process by which state courts compel compliance with their judgments. 481 U.S. at 13, 107 S.Ct. at 1527. However, Justice Powell, writing for the majority in *Pennzoil*, explicitly states that

> [o]ur opinion does not hold that *Younger* abstention is always appropriate whenever a civil proceeding is pending in a state court. Rather, as in *Juidice*, we rely on the state's interest in protecting "the authority of the judicial system, so that its orders and judgments are not rendered nugatory."

481 U.S. at 14, n. 12, 107 S.Ct. at 1527, n. 12 (citations omitted). We believe that both the unusual circumstances surrounding this case, the irreparable injury that will occur to the handicapped plaintiffs if this court does abstain, and the nature of the contempt proceeding vis-a-vis the prior state court proceedings all require us not to abstain.

As we discussed above, the nine handicapped plaintiffs residing at Casa Marie are appearing before this court for the first time. Another five have intervened through Legal Services. These latter five attempted to intervene in the local court proceedings prior to coming to this court. As stated before, no evidence appears before us that the local court ruled on the intervention motion or stayed the execution of the contempt order pending disposition of the new action filed by the residents of Casa Marie. It was at this point that Legal Services sought permission to intervene in the federal court proceedings. All of the handicapped plaintiffs have come to this court when they are threatened with almost certain eviction resulting from the incarceration of the operators of Casa Marie. We are not faced with plaintiffs who have sought to ignore, avoid or escape local judgments. Rather, we are confronted by persons who have had either no direct connection with the local proceedings or who have attempted to engage themselves, without response. Quite simply, we do not

---

**13.** *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); *Pérez v. Ledesma*, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); and *Boyle v. Landry*, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971).

feel that these plaintiffs have shown the kind of disrespect for state judicial proceedings that were present in *Juidice* and *Pennzoil* and which would warrant this court's abstention.

Nor do we see how irreparable harm to the handicapped plaintiffs can be avoided if we abstain and allow the local court to effectuate its judgment. The administrators of Casa Marie will be incarcerated. The residence will not be able to function. We have testimony before this court from officials at DSS that there are not sufficient facilities in Puerto Rico for the type of resident at Casa Marie. Presumably, the local court or DSS would have to monitor the transferral of the plaintiffs. We find that there most certainly would be irreparable harm to these plaintiffs if, in fact, their federal rights are being violated and this court does not intervene.

Also, the type of local court proceedings with which we are faced here is quite different from that discussed in the Supreme Court cases cited above. We are not dealing here with individuals who have simply ignored judicial process as in *Juidice*. Nor did the directors of Casa Marie, with respect to the original judgment, fail to exhaust appeals to the Puerto Rico Supreme Court as in *Huffman*. Nor will we be interfering with pending state proceedings that deal with state interests similar to those of child welfare as in *Moore*. In this case, balancing the harm that would almost assuredly befall the handicapped plaintiffs if we were to abstain with the effect that intervention would have with respect to the principle of comity between federal and state courts, we rule on the side of intervention and find that the *Younger* abstention doctrine does not apply. We now examine the substantive claims.

## IV. *Discussion*

### A. Section 1983 Claim

Plaintiffs allege that defendant neighbors of Casa Marie have violated plaintiffs' fourteenth amendment right to equal protection under the law. Specifically, plaintiffs allege that defendants initiated legal action in order to evict the residents of Casa Marie, and that the restrictive covenants and construction violations are simply a pretext to mask their discriminatory intent.

In order to find a violation under section 1983, the court must find that the defendants,

> under color of any statute, ordinance, regulation, custom, of any State or Territory or the District of Columbia, subjects, or *causes to be subjected, any citizen of the United States* ... to the deprivation of any rights, privileges, immunities, secured by the Constitution and laws, shall be liable to the party injured in an action at law, *suit in equity*, or other proper proceeding for redress.

42 U.S.C. § 1983 (emphasis added). The court must make two inquiries before finding liability under section 1983. First, plaintiffs must establish that defendants acted "under the color of state law." Once this determination has been made, the second inquiry is to determine whether defendants' actions have, in fact, violated plaintiffs' constitutionally-protected rights. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981); *Williams v. City of Boston*, 784 F.2d 430, 433 (1st Cir.1986).

This case presents a somewhat different issue from one recently decided by this court, *A.F.A.P.S. v. Regulations & Permits Administration*, 740 F.Supp. 95 (D.P.R.1990), where we found a Fair Housing Act violation against A.R.P.E. for denying a special use permit to an AIDS facility. In *A.F.A.P.S.*, it was the governmental agency A.R.P.E. that was discriminating against the plaintiffs. Here, private citizens are using the state judicial system to enforce a facially-neutral zoning statute and restrictive covenant. A.R.P.E. is not before this court as a defendant. In fact, plaintiffs insist, and officials from A.R.P.E. agree, that but for the local court action, Casa Marie would be able to apply to A.R.P.E. for the necessary permits and variances and could qualify to receive A.R.P.E.'s endorsement as part of DSS' licensing process.

In *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), the United States Supreme Court was confronted with a situation analogous to the matter before us. In *Shelley,* homeowners resorted to the state courts to enforce racially restrictive covenants. The Court distinguished between the covenants themselves and the act of enforcing them in the state courts. While the covenants themselves did not constitute "state action" for purposes of the fourteenth amendment, the act of enforcing the covenants through the state judicial system did. 334 U.S. at 13–14, 68 S.Ct. at 842. The Court stated "that state action in violation of the [fourteenth] Amendment's provisions is equally repugnant to the constitutional commands whether directed by state statute or taken by a judicial official in the absence of a statute." 334 U.S. at 16, 68 S.Ct. at 843. The Court later extended the rule in *Shelley* to suits for damages, *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), and to section 1983 actions. *See Adickes v. S.H. Kress and Company,* 398 U.S. 144, 169–171, 90 S.Ct. 1598, 1614–15, 26 L.Ed.2d 142 (1970). We therefore find that defendants' use of the judicial system to discriminate is "state action" for purposes of section 1983.

Having found state action, we must determine what protected rights, if any, have been violated. Plaintiffs claim that defendants' actions in attempting to close Casa Marie violate the Equal Protection Clause of the fourteenth amendment. We rely on the holding and the analysis of *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In *City of Cleburne,* "a Texas city denied a special use permit for the operation of a group home for the mentally retarded, acting pursuant to a municipal zoning ordinance requiring permits for such homes." 473 U.S. at 435, 105 S.Ct. at 3251. The Court, applying the general rule "that legislation is presumed valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest", 473 U.S. at 440, 105 S.Ct. at 3254, found that, even under the lowest standard of court review, "[t]he

State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." 473 U.S. at 446, 105 S.Ct. at 3258. The Court further stated that "the mentally retarded, like others, retain their substantial constitutional rights in addition to the right to be treated equally by the law." 473 U.S. at 447, 105 S.Ct. at 3258. The Court then went on to examine the specific ordinance to determine whether, in fact, it was legitimate to require a special use permit for this type of home and held that it was not. 473 U.S. at 450, 105 S.Ct. at 3259. The Court found that the reasons cited by the City Council for requiring the permit—fear of the mentally handicapped by neighbors who lived near to the proposed home, concern that the children who attend the nearby school might harass the mentally retarded residents notwithstanding the fact that about 30 mentally retarded students attended the same school, and the size of the proposed home as compared with other residences in the area—all "rest[ed] on an irrational prejudice against the mentally retarded." 473 U.S. at 450, 105 S.Ct. at 3260. The Court also noted these concerns were even more irrational given that this residence for the mentally retarded would be supervised and would have to conform to the standards imposed by federal and state law. The Court concluded that requiring a permit in this case violated the fourteenth amendment.

The situation before us is almost a carbon copy to that faced by the Court in *Cleburne.* Before us are neighbors who have invoked restrictive covenants and zoning ordinances within the state judicial processes to deny these elderly, handicapped citizens a right to live in their neighborhood. The rationales that defendants presented to this court to close Casa Marie and force the residents to move are arbitrary and irrational and represent some of the same reasons stated by the neighbors in *Cleburne.* The fact that children might disturb the elderly by playing in a nearby play area has no rational basis and, in fact, is contrary to expert testimony given be-

fore this court that the presence of children actually lessens the depression that may strike the elderly handicapped. Neighbors' and property owners' fears that having elderly, handicapped persons living in the neighborhood might change its residential character and affect property values have not been validated before this court. Those fears only represent the position that any person who might need to live in congregate-housing is necessarily different from the general population and should have less right to reside in the neighborhood than a person who owns their property. This court witnessed first-hand the location of Casa Marie and found it sufficiently isolated from the rest of Jardines de Arecibo and with sufficient surrounding space. Consequently, the issues of inadequate parking and excessive noise are nothing more than pretexts used to rationalize discrimination. Finally, defendants' argument that their objection to Casa Marie has nothing to do with the fact that elderly, handicapped residents reside there but rather because of the business character of Casa Marie, whose presence continues to erode the residential character of the neighborhood, is disingenuous for the following reasons. First, Casa Marie is a non-profit organization. Its purpose is not to make money for its corporate directors but rather to fulfill its stated mission to care for the elderly handicapped. Defendants have produced no evidence to demonstrate that the operators of Casa Marie are not acting within the scope of their corporate charter. Second, under Puerto Rico zoning law, homes for the aged are one type of use permitted in the R–3 classification. Third, defendants' objections to the renovations done by Casa Marie go well beyond simply enforcing restrictive covenants or zoning ordinances. The very breadth of the order sought in the local court highlights that it is the presence of the elderly handicapped to which the neighbors object. In the papers filed before the local courts, defendants asked the court to permanently enjoin *A.R.P.E.* from *ever* issuing *any* use variance for *any* purpose for the properties which constitute Casa Marie. Theoretically, five years from now,

according to defendants' prayer for relief in the local court case, if the buildings were sold to handicapped or elderly persons who needed to renovate in order to have full use and enjoyment of the property, they would have to go to state court, rather than A.R.P.E., for the proper variance permits and the local court would have to modify its present judgment. In other words, defendants were requesting far more relief from the local courts than simply ceasing the "business" aspect of Casa Marie. From this, the discriminatory intent is evident. Defendants sought to burden the owners of those properties in ways that were distinct from normal burdens imposed upon property owners in Jardines de Arecibo.

Finally, as in *Cleburne*, Casa Marie is receiving far more government supervision than any other residence in Jardines de Arecibo. DSS, A.R.P.E., the Fire Department, the Police Department, and the Department of Health all have regular access to Casa Marie to assure that the operators are complying with local law. If they are not, DSS has the power to revoke their license to operate and petition the state court to close Casa Marie. Therefore, we find that defendants' use of the state judicial system based on an impermissible distinction between the elderly handicapped residents of Casa Marie and other citizens and as such is violative of the fourteenth amendment. This court therefore finds a violation of 42 U.S.C. section 1983.

**B. Fair Housing Act Violation**

▮▮▮ Plaintiffs also allege a violation of the Fair Housing Act, 42 U.S.C. §§ 3601–3631. Under the statute, private litigants are granted the right to challenge discriminatory practices. 42 U.S.C. § 3613(a). The Fair Housing Act prohibits discrimination on the basis of physical or mental handicaps. Section 3604(f)(1) makes it unlawful

[t]o discriminate in the sale or rental, or otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter;

(B) a person residing in or intending to reside in that dwelling after it was so sold, rented, or made available; or

(C) any person associated with that buyer or renter.

Section 3617 further provides that

[it] shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on having account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

Before analyzing plaintiffs' claim, we must determine whether the plaintiffs are, indeed, handicapped and therefore fall within the class of persons protected by the statute.

Section 3602(h) defines handicap with respect to a person as:

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

(2) a record of having such an impairment, or

(3) being regarded as having such an impairment.

During our inspection visit, it was clear that a majority of the residents at Casa Marie were suffering from chronic illnesses of the type testified to by Dr. Sánchez. Most of them were confined to bed or wheelchairs, with obvious diminishment in their ability to ambulate. Under the definition given above, it is clear that the residents of Casa Marie are included in the definition of "handicapped" for purposes of the statute. In addition, Dr. Sánchez stated explicitly that older senior citizens (over 75), as a group, are often regarded as being handicapped and are treated as such. Therefore, we find that all the elderly residents of Casa Marie are "handicapped" for purposes of section 3602(h)(3).

Recently, this court has had occasion to rule on the applicability of these provisions with relationship to the establishment of an AIDS hospice. *A.F.A.P.S. v. Regulations*

*& Permits Admin., supra.* We find a number of parallels between the two cases and will follow the same analytical framework. Applying either the "discriminatory intent" method or the "disparate impact" analysis of proving a violation under this Act, *see A.F.A.P.S.*, 740 F.Supp. at 103, we find that defendants here have violated provisions of the Fair Housing Act.

Using the "discriminatory intent" method, plaintiffs must demonstrate that their handicap formed some part of the basis for defendants' actions even if it was not the sole motivating factor. *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1037 (2d Cir.1979); *Baxter v. City of Belleville, Ill.*, 720 F.Supp. 720 (S.D.Ill.1989). We find that plaintiffs have more than fulfilled this requirement.[14]

As we explained above, the defendants in this case went to local court with the intention that Casa Marie be ordered to cease functioning as a home for the handicapped elderly. Testimony of defendants pointed to the fact that the presence of this type of residence "might" lower property values, would cause people to "think about death" with the sight of hearses and ambulances, and would hinder the spontaneity of the neighborhood children. Even if other motives inspired defendants' use of the judicial system to exclude Casa Marie from Jardines de Arecibo, plaintiffs have produced sufficient evidence to show defendants' intent to discriminate against plaintiffs as required by the Act.

Under the "disparate impact" test, the court must examine whether the effect of defendants' action is unnecessarily discriminatory even though no intent to discriminate is shown. *A.F.A.P.S.*, 740 F.Supp. at 103. Applying the four-pronged analysis of *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir.1977), where the four factors analyzed are:

"(1) the strength of plaintiff's showing of discriminatory effect; (2) whether there is some evidence of discriminatory intent; (3) defendant's professed interest

---

14. *See* discussion under equal protection analysis, *supra.*

in taking the action complained of; and (4) whether the plaintiff seeks to compel the defendant to affirmatively provide housing for members of a protected class or merely seeks to restrain the defendant from interfering with individual property owners wishing to provide such housing,"

*A.F.A.P.S.*, 740 F.Supp. at 106, we find that plaintiffs have demonstrated discrimination under the Fair Housing Act.

The first prong, discriminatory effect, is clearly present. As the neighbors' complaints were specifically addressed to issues surrounding elderly handicapped care (ambulances, hearses, coffins, and the like), any attempt to rid their neighborhood of those alleged nuisances will necessarily have a disparate impact on the elderly, handicapped who will always be seen to be associated with those supposed "evils". Even if the neighbors' complaints were truly the outward manifestations of legitimate concerns (and not pretextual justifications covering intentional discrimination against the people themselves), the *effect* would be a broad-scale exclusion of the elderly handicapped as opposed to any other group of potential residents.

As we pointed out in *A.F.A.P.S.*, 740 F.Supp. at 106, the second prong of this analysis requires that plaintiffs produce some evidence of discriminatory intent, although less than that quantum of evidence necessary to establish a fourteenth amendment violation. *See Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). As our discussion above with respect to the section 1983 claim reveals, plaintiffs have more than established defendants' intent.

As to the third part of the disparate impact test, we must evaluate defendants' professed interest in going to the local court to enforce restrictive covenants and zoning/building codes. The defendants have offered as a rationale for going to court the desire to stop the establishment of businesses in Jardines de Arecibo. We find this rationale nothing more than a pretext. When one of the defendants was queried about the fact that there were over forty businesses in Jardines de Arecibo, some of which operated out of family residences also zoned as R–3, she answered that they were not her concern because "they" were "on other blocks" and only Casa Marie was close to her home. Clearly, plaintiffs have established the third prong of this test.

Finally, the type of relief requested by plaintiffs is simply to be free of neighborhood interference as they provide residence for the elderly handicapped. Plaintiffs are not asking assistance from this court to compel any governmental agency to remove · legitimate obstacles to licensing. They testified that they are fully willing to comply with the requirements imposed by DSS. In this case, this factor also turns in favor of plaintiffs.

We therefore hold that plaintiffs have established a violation of the Fair Housing Act under both methods of analysis.

### C. Anti–Injunction Statute

 Having found both constitutional and statutory violations, we must resolve an additional issue before we can grant the injunctive relief requested by plaintiffs. As defendants have correctly pointed out, there is a federal statute which states that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283 (hereinafter referred to as the "Anti–Injunction Statute"). Defendants argue that even if we were to find a violation, this court is without the necessary power to provide injunctive relief to stay state court proceedings. However, we find that the "expressly authorized by Act of Congress" exception to 28 U.S.C. section 2283 applies to both section 1983 and the Fair Housing Act and therefore this court does have the power to grant plaintiffs' injunctive relief.

With respect to plaintiffs' section 1983 claim, the United States Supreme Court, in *Mitchum v. Foster*, 407 U.S. 225, 243–44, 92 S.Ct. 2151, 2162–63, 32 L.Ed.2d 705 (1972), held that section 1983 "is an Act of Congress that falls within the "expressly

authorized" exception of that [Anti–Injunction statute] law." Therefore, this court is authorized to stay the state court proceedings where a section 1983 violation is found.

As to the power to stay a state court proceeding under the Fair Housing Act, the inquiry is more complicated. The Court, in *Mitchum*, described the test which lower courts must use to determine whether a federal statute should be included within the "expressly authorized" exception to section 2283.

> [I]t is clear that, in order to qualify as an 'expressly authorized' exception to the anti-injunction statute, an Act of Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding. This is not to say that in order to come within its exception an Act of Congress must, on its face and in every one of its provisions, be totally incompatible with the prohibition of the anti-injunction statute. The test rather, is whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding.

407 U.S. at 237–38, 92 S.Ct. at 2159–60 (footnote omitted). Our research has found only one case which has posed the issue of whether the "expressly authorized" exception to the Anti–Injunction Statute applies to the Fair Housing Act. *R.F.M.S. Inc. and D & M Partnership v. Village of Alsip Park District*, 1990 WL 71028, 1990 U.S. Dist. Lexis 6368 (N.D.Ill. May 16, 1990). In this case, the court found that the *Younger* abstention applied and did not address the Fair Housing Act issue.

Applying the *Mitchum* test, we find that the Fair Housing Act is an Act of Congress that has created uniquely federal rights, enforceable in a court of equity by private parties. The legislative history of the 1968 Act stated that

[t]he present bill reaches private interference as well as interference by state officials. While the 14th and 15th amendments, of their own force, do not forbid private discrimination, they expressly authorize Congress to enact appropriate legislation to "enforce" the substantive guarantees. The scope of this congressional implementing power is broad ... It surely comprehends legislation punishing private persons who for racial reasons engage in acts or threats of violence that obstruct access on equal terms to the facilities and benefits which a State provides its citizens, and thereby thwart the attainment of the promise of the 14th and 15th amendments.

SENATE COMM. ON THE JUDICIARY, CIVIL RIGHTS ACT OF 1968, S.Rep. No. 721, 90th Cong., 2nd Sess., *reprinted in* 1968 U.S. CODE CONG. & ADMIN. NEWS 1837, 1843 ("1968 Legislative History"). It is clear from this language that Congress' intent was to provide a broad federal statutory remedy to combat the discriminatory acts of private parties in the area of housing. Therefore, the first part of the *Mitchum* test is satisfied.

Section 3613(c) of the Fair Housing Act provides:

In a civil action under subsection (a) of this section, if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d) of this section, may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

42 U.S.C. § 3613(c). It is clear from the legislative history to the 1988 Amendments to the Act that while Congress originally intended the Fair Housing Act to "provide[ ] a clear national policy against discrimination in housing, it provide[d] only limited means of enforcing the law." HOUSE COMMITTEE ON THE JUDICIARY, FAIR HOUSING AMENDMENTS

ACT OF 1988, H.Rep. No. 711, 100th Cong., 2nd Sess. 15, *reprinted in* 1988 U.S. CODE CONG. & ADMIN. NEWS 2173, 2176 ("1988 Legislative History"). The 1988 Amendments acknowledge that the "[e]xisting law has been ineffective because it lacks an effective enforcement mechanism. Private persons and fair housing organizations are burdened with primary enforcement responsibility." 1988 Legislative History at 2177. Along with adding additional administrative enforcement procedures, the amendments continued to allow a private right of action to enforce the statute. 1988 Legislative History at 2200. With respect to the remedies available to private parties, "[t]he Committee intends that courts be able to award all remedies provided under this section." 1988 Legislative History at 2201.

This brief review of the legislative history convinces us that Congress' intention in enacting and amending the Fair Housing Act was to provide broad and far-reaching relief against discrimination in housing similar to the broad remedial scheme of other Civil Rights statutes.[15] Implicated in the broad purpose and remedial nature of the Act's goal of reversing discrimination, the power to enjoin state court proceedings would be necessary to effectuate its purposes. Like section 1983, the Fair Housing Act "opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation." *Mitchum*, 407 U.S. at 239, 92 S.Ct. at 2160 [footnote omitted]. It is obvious that state courts could be used to apply facially-neutral zoning laws, building codes, restrictive covenants, and other state statutory law related to the regulating housing. Housing is an area replete with state law

rules and regulations and private contracts. One can easily imagine scenarios where, while the state court involvement might be ancillary to a discriminatory act (that is, the state court proceeding would not actually trigger state action allowing for a section 1983 action), still the full enforcement of a Fair Housing Act violation would require enjoining state court proceedings. As the Supreme Court stated in *Mitchum*, "federal injunctive relief against a state court proceeding can in some circumstances be essential to prevent great, immediate, and irreparable loss of a person's constitutional rights." 407 U.S. at 242, 92 S.Ct. at 2162 (cites omitted). We find this to be the case with respect to the statutory claim of the residents of Casa Marie. Without enjoining the local court, plaintiffs' right to live at Casa Marie free from impermissible interference by neighbors would be impossible. This court therefore finds that the Fair Housing Act is included in the "expressly authorized" exception to the Anti–Injunction statute and that this court is not barred from staying state court proceedings as part of a remedy for violations of provisions of this Act.

### V. *Conclusion*

Having found that the elderly handicapped plaintiffs in this case, residents of Casa Marie, are not barred by principles of *res judicata* or by any statute of limitations, we now ORDER injunctive relief pursuant to 42 U.S.C. section 1983 and the Fair Housing Act as a remedy for the fourteenth amendment and Fair Housing Act violations as discussed in this Opinion and Order.

The plaintiffs in the Arecibo Superior Court action, defendants herein, and the Superior Court of Arecibo, are permanently enjoined[16] from further enforcing the local

---

**15.** Here, we cite the language from *Mitchum*, which was also quoted approvingly by Justice (now Chief Justice) Rehnquist in *Vendo v. Lektro–Vend Corp.*, 433 U.S. 623, 633, 97 S.Ct. 2881, 2888–89, 53 L.Ed.2d 1009 (1977):
This legislative history makes evident that Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights; it was concerned that state instrumentalities could not protect those

rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights, and it believed that these failings extended to the state courts.
407 U.S. at 242, 92 S.Ct. at 2162.

**16.** We note that at trial, this court consolidated the hearing on the preliminary injunction with the trial on the merits as to all issues except damages. Fed.R.Civ.P. 65(a)(2).

court judgment that gave validity to selective and discriminatory enforcement of restrictive covenants or building code violations that deprived these elderly residents of rights secured to them under the Constitution and laws of the United States.

Plaintiff Casa Marie, Hogar Geriátrico, Inc., its directors and managers, also plaintiffs herein, are ORDERED to comply with all local laws and procedures required to complete legalization and licensing of the Casa Marie facility, and to work in conjunction with the Department of Social Services, Commonwealth of Puerto Rico, to achieve this end, in protection of the rights of the remaining elderly handicapped plaintiffs. After all, these plaintiffs have undertaken a serious legal responsibility and the fact that they house a protected group will not shield them from compliance with that responsibility.[17]

Nothing in this order shall be read as a defense to or injunction against any subsequent state proceeding brought by any Commonwealth or municipal agency in order to enforce applicable federal, state or municipal laws or regulations regarding the licensing or operation of the Casa Marie facility, so long as such actions are not brought for the reasons ruled invalid in this opinion, nor which will cause the discriminatory effect prohibited by today's order.

Other than stated above, the complaint of Casa Marie, Maria Plá, Francisco Conrado Monrouzeau, Victor Plá, and Damaris Rodriguez will be dismissed, the court only retaining jurisdiction over them for the purposes outlined in this order.

We further ORDER counsel for the remaining plaintiffs and intervenors to show through proffer backed up by affidavits subscribed by plaintiffs and intervenors, what damages, if any, may be recoverable in this case. In this respect, we note that the rights of these elderly have been quickly vindicated by the injunctive relief afforded by this court, and we find it hard to

believe that quantifiable damages have indeed accrued. Ten days are granted to comply.

IT IS SO ORDERED.

---

17. This record shows numerous instances where the corporate plaintiffs have disregarded clearly-established building and zoning regulations. In so doing, they have acted inconsistently with what is required of one who requests equitable relief. While we will not allow their dirty hands to bar the claims of the other plaintiffs, we note strongly that future compliance will be required both by local authorities and by this court.