**OXFORD HOUSE–EVERGREEN, Kevin Tierney, James Curtis, Frederick Furlong, James Valentine, Kenneth Knight, Joseph Logan, Jamiel K. Muhammad, "John Does," Oxford House, Inc., and Debbie Ann Weiner, Plaintiffs,**

v.

**CITY OF PLAINFIELD, Mayor and Council of the City of Plainfield, Jocelyn Pringley, and the Plainfield Zoning Board of Adjustment, Defendants.**

Civ. No. 91–2855(HLS).

United States District Court,
D. New Jersey.

Aug. 1, 1991.

dence for recovering addicts of drugs and alcohol, pending further hearings and a determination in state court proceedings. The plaintiffs are part of a nationally recognized program which, through peer pressure and strict conditions of abstinence, successfully maintains freedom from addiction and improves the lives and opportunities of its participants. For its success, however, it requires a minimum number of members at each location. The defendants have established a maximum which forecloses the viability of the endeavor and will require vacation of the subject premises absent intervention by this court.

There are few among us who do not have a friend or relative who has suffered the ravages of drugs or alcohol. They are persons who need our compassion and require our support. To evict these plaintiffs from their premises and deny them an opportunity for a full and fair hearing condemns their efforts and violates the applicable law.

The defendants have limited the use of said premises to six persons; the plaintiffs require nine in order to be viable. The municipality can survive having three additional persons at this residence until the state court rules, but the plaintiffs cannot survive without them.

The intervention of this court is for a limited purpose and for a limited duration. In the interim, plaintiffs should be permitted to follow their path to rehabilitation and be encouraged in their efforts. In so doing, the harm to the City is minimal; the irreparable harm to the plaintiffs is avoided.

However, what this matter truly needs is not judicial action, whether it be state or federal, but for the parties to search their consciences, recognize the needs and hopes of the plaintiffs and the concerns and fears of the neighbors, and arrive at an accommodation which serves and enriches all who are involved in and affected by it.

Susan R. Oxford, Wilfredo Caraballo, Public Advocate, Dept. of the Public Advocate, Div. of Public Interest Advocacy, Trenton, N.J., for plaintiffs.

Gerald T. Ford, Siff, Rosen & Parker, Newark, N.J., for defendants.

## OPINION

SAROKIN, District Judge.

*Introduction*

The plaintiffs in this matter seek relief which will permit them to maintain a resi-

*Background*

Before the court is plaintiffs' motion for a preliminary injunction and defendants'

cross-motion to dismiss or stay the complaint.

This action arises out of a motion brought on behalf of a group of recovering alcoholics and drug addicts to vacate or stay the restraints imposed by the New Jersey Superior Court, limiting the number of residents in the house at 1150 Evergreen Street, in the City of Plainfield, to six, and barring the use of the third floor of the house. The plaintiffs also ask this court "to order the City of Plainfield to cease and refrain from interfering with the house's continuation pending the final outcome of this case." Plt. Brief at 1–2.

Plaintiffs are current, former, and prospective residents of 1150 Evergreen Avenue, · Plainfield, New Jersey; Oxford House–Evergreen, an unincorporated association operated under a charter issued by Oxford House, Inc., comprising the residents of the property located at 1150 Evergreen Avenue; Oxford House, Inc., a non-profit, tax exempt Delaware corporation; and Deborah Ann Weiner, the owner of 1150 Evergreen. The suit is brought against the City of Plainfield, the Mayor and Council of the City, Jocelyn Pringley, Director of the Division of Inspection and Zoning Officer, and the Plainfield Zoning Board of Adjustment.

On September 22, 1989, the New Jersey State Department of Health awarded a grant to Oxford House, Inc. ("OHI") to establish "Group Homes for Substance Abusers." Plt.App. 32. The grant mandated that OHI should "[n]egotiate any required local and state approvals prior to opening." Plt.App. 33. On April 27, 1989, Ms. Weiner, owner of a large, eight-bedroom single family home at 1150 Evergreen in the City of Plainfield, signed a three year lease with OHI on behalf of Oxford House–Evergreen ("OH–E"). Defendants argue that OHI failed to make efforts to obtain the required acceptance from Plainfield zoning officials before signing the lease. Plaintiffs claim that Zoning Officer Jocelyn Pringley had stated that the proposed use was permitted. Plt.App. 50 (Bernice Paglia, "Recovering Addicts May Stay in House," *Courier–News* (May 2, 1990)).

Oxford Houses are intended to provide a drug and alcohol-free environment combined with the support and encouragement of other recovering persons. The Houses, pursuant to 42 U.S.C. § 300x–4a, are required to be democratically run and financially self-supporting, and to expel any individual who relapses. These Congressional requirements are based on the Oxford House model. Plt. Brief at 4. Reflecting its commitment to fighting drug and alcohol abuse, New Jersey entered into a contract with OHI to administer a $100,000 revolving loan fund to assist in the establishment of new recovery houses. Regan Aff., Plt.App. 27; 32–33.

No professional staff resides in Oxford Houses, and no professional treatment is provided. The houses have three fixed rules: no use of drugs or alcohol, no disruptive behavior, and regular payment of rent. Molloy Affidavit ¶ 4, Plt.App. 11. These rules are enforced by the residents themselves, with guidance from OHI. *Id.* at 26. The current group decides who will move in to the house and how house chores are to be divided. Oxford Houses are not treatment facilities, but rather houses rented by a group of individuals recovering from drug or alcohol addiction.

The lease at OH–E was to begin on June 1, 1990. On May 15, 1990, Ms. Pringley issued a notice of violation to OHI and Ms. Weiner, advising them that their proposed use of the residence was inconsistent with the single-family residential zone requirements. Construction was commenced on the residence, without a building permit, and a Construction Code Inspector issued a stop work order on May 31, 1990. On May 31, 1990, construction continued, and police were called to have the contractor leave the premises. On or about June 2, 1990, the initial OH–E occupants moved in to the residence.

Plaintiffs claim that neighbors learned of the proposed use of 1150 Evergreen about a month before the lease was to begin, and publicly objected, contacting city officials in an attempt to block the current residents

from moving in to the premises. *See* Negley and Cangelosi, "Neighbors Oppose Evergreen Facility" (Letter to Editor), *Courier News*, Plt.App. at 49; Michelle Weiss, "Opposition to Rehab Center to be Heard," *Courier–News* (May 5, 1990), Plt.App. at 51. At a May 7, 1990 City Council meeting, the Council voted to authorize litigation to challenge the proposed use; the resolution "was greeted by an enthusiastic ovation." City Council Minutes at 26, Plt.App. at 36.

On June 6, 1990, the City filed a Complaint and Order to Show Cause against OHI and Ms. Weiner, the owner of the property (*"Oxford House I"*), seeking to enjoin OH–E's use of the property. Judge Menza of the New Jersey Superior Court denied the City's request for temporary restraints to prevent occupancy; he also ordered the residents to provide immediate access to the City's construction code, fire, and housing inspectors. Def.Exh. F. On June 15, 1990, the return date for the Order to Show Cause, the state court entered an order barring any new occupants from moving in and restraining the residents from using the third floor of the house.[1]

The trial court transferred the matter to the Plainfield Zoning Board of Adjustment for an evidentiary hearing on the validity of the Zoning Officer's decision and on OHI's claims under the Federal Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.* Plt.App. 57.

The Zoning Board, according to plaintiffs herein, refused to consider OHI's claims under the Fair Housing Act during the hearings. *See* Zoning Board hearing, August 21, 1990, Tr. at 258–59. The hearings ended with a Board resolution of December 5, 1990, upholding the Zoning Officer's finding that the proposed use was not permitted. The Board concluded that OH–E "has some elements of a non-familial institution," Plt.App. 105, and that its residents

do not constitute a "family" under the applicable state law definition:

One (1) or more persons living together as a single non-profit housekeeping unit whose relationship is of a permanent and domestic character, as distinguished from fraternities, sororities, societies, clubs, associations.... All commercial residences, non-familial institutional uses, boarding homes and other such occupancies shall be excluded from one-family zones.

Plainfield Zoning Code § 17.3–1(17). The Board found that the residents were not "permanent" or "domestic," because of their transiency and lack of "intimacy." Plt.App. 104–05.

OHI did not appeal the decision of the Board of Adjustment, but instead filed a separate action in Superior Court (*"Oxford House II"*), challenging the decision as arbitrary and capricious and a violation of the Federal Fair Housing Act. No. UNN–L–979–91 (Super. Court of N.J., Union County Feb. 4, 1991), attached as Def.Exh. P.[2] The plaintiff in that action is OHI; defendants are the City, the Board, and Ms. Pringley. The case was assigned to Judge Menza, who held a pre-trial hearing on July 5, 1991, resulting in an extensive pre-trial order. Def.Exh. R. The order calls for briefs by August 5, 1991. A hearing is scheduled for September 3, 1991.

The restraints have remained in effect since Judge Menza ordered them. The state court twice denied OHI's motions to lift the restraints. However, at the July 31, 1990 hearing on OHI's first motion, Judge Menza modified his earlier order and allowed the house to replace the prior residents with new residents, should they leave, provided that the cap of six (the number of persons who had already moved in to the premises when the first action was brought) was not exceeded. Order

---

1. A further hearing was held on July 6, 1990. The results of the two hearings on June 15 and July 6 were memorialized in an order dated July 13, 1990. Plt.App. at 54.

 Plaintiffs herein maintain that the state court's order was entered before OHI had retained legal representation. Plt. Brief at 11. Defendants maintain that OHI appeared at the

June 6, 1990 hearing on the City's Order to Show Cause with an attorney. Def. Brief at 8.

2. At oral argument, plaintiffs claimed that Judge Menza required them to file a separate action, rather than return to his court after the Board's resolution, through a continuation of *Oxford I.*

dated Aug. 17, 1990, Plt.App. 71–72. The state court found that the City had a likelihood of success on the merits. Plt.App. 67. With regard to the restriction on use of the third floor, Judge Menza relied on the certification of the Captain of the Bureau of Fire Prevention that a second means of egress from the third floor was lacking. Plt.App. 65–66. OHI's second motion for lifting the restraints was denied at an October 15, 1990 hearing, where Judge Menza rejected OHI's argument that it faced financial difficulties which could lead to irreparable harm. · See Def. Brief at 12, citing Def.Exhs. K–N (Affidavits submitted to Superior Court). OHI's appeals to the Appellate Division and the New Jersey Supreme Court to lift the temporary restraints have also been unavailing. Plt. App. 75–76. Those appeals were denied on October 25, 1990, and December 4, 1990, respectively.

Plaintiffs filed this action on June 28, 1991. In their complaint, see Def.Exh. E, plaintiffs allege violations of the federal Fair Housing Act Amendments of 1988, the Rehabilitation Act of 1973, the Equal Protection and Due Process Clauses of the United States and New Jersey Constitutions, the New Jersey Municipal Land Use Law and the New Jersey Law Against Discrimination. In their current motion, plaintiffs ask this court to vacate or stay the restraints placed by the state court, pending the completion of its proceedings in this matter. Plaintiffs claim that they cannot financially support the house with only six residents instead of the eight to ten[3] that the house can sustain, and that they face imminent eviction. Plaintiffs argue that the state court restraints do not simply maintain the status quo, but will have the effect of the residents' eviction and the closing of OH–E. Plaintiffs also argue that the therapeutic nature of OH–E suffers from having a restricted number of residents. Defendants have filed a cross-motion to dismiss or stay this action pending the state court's proceedings.

The United States Justice Department has moved for leave to participate in this action as amicus curiae on behalf of plaintiffs. That application will be granted.[4] The United States notes that on July 20, 1990, and October 17, 1990, OHI filed a housing discrimination complaint with the Secretary of the Department of Housing and Urban Development ("HUD"), pursuant to 42 U.S.C. § 3610. On October 24, 1990, the General Counsel of HUD referred the complaint to the Department of Justice, pursuant to § 810(g)(2)(C) of the Fair Housing Act and 24 C.F.R. § 103.400(a)(2) (1990), for appropriate action under § 814(b)(1). The United States also notes that it is currently litigating similar issues in *United States v. Borough of Audobon, New Jersey*, Civ. No. 90–3771 (JFG) (D.N.J.). Trial in that case, which also involves a challenge to municipal action taken against a local Oxford House, commenced July 15, 1991.

## Discussion

### I. Abstention

Defendants argue on their cross-motion to dismiss that this court should abstain from ruling on the instant matter, due to the concurrent state proceeding that involves the same parties, problem, and issues. Indeed, the first question the court must address is the issue of abstention.

The court notes that abstention is the exception, rather than the rule. Abstention is an

> extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the

---

**3.** It is unclear how many residents plaintiffs would ultimately like to be allowed to live at OH–E. See Plt. Brief at 41 (requesting 10 to 12); Polin Certif., Def.Exh. M, at ¶ 14 (with the heating expenses that will occur in the winter months, at least ten persons will be necessary). However, at oral argument plaintiffs' counsel stated that, at least for the interim period until the resolution by the state court of this issue, nine residents would be sufficient.

**4.** The motion has not been opposed by defendants.

State court would clearly serve an important countervailing interest.

*Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). There are three kinds of abstention. Abstention is appropriate where a case presents a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law. *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The second abstention doctrine, based on *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), is appropriate where, absent bad faith, harassment, or a patently invalid state statute, federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings. The third form of abstention, under *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), provides that abstention is appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public importance whose importance transcends the result in the case at bar. Also, even if none of the three categories apply, the court must consider the *Colorado River* additional factor of judicial economy. 424 U.S. at 817, 96 S.Ct. at 1246.

### A. *Pullman abstention*

■ *Pullman* abstention requires three elements: (1) uncertain issues of state law underlying the federal constitutional claims brought in the district court; (2) amenability of the state law issues to a state court interpretation that would obviate the need for, or substantially narrow, adjudication of the federal claims; *and* (3) disruption of important state policies through a federal court's erroneous construction of state law. *Hughes v. Lipscher,* 906 F.2d 961, 964 (3d Cir.1990).

■ Defendants argue that the first prong of this test under the *Pullman* doctrine is met because New Jersey law is "rapidly developing" on the issue of what constitutes a "family" as defined in the zoning ordinance. Def. Brief at 19. Indeed, the New Jersey Superior Court in *Open Door Alcoholism Program, Inc. v. Board of Adjustment,* 200 N.J.Super. 191, 491 A.2d 17 (App.Div.1985), ruled that a halfway house for ten recovering alcoholics did not constitute a single family dwelling. The court found that the residents failed to exhibit

> a kind of stability, permanency, and functional lifestyle which is equivalent to that of the traditional family unit. In our view, the residents of plaintiff's proposed halfway house, although comprising a single housekeeping unit, would not bear these generic characteristics of a single family. While the residents would share in the household responsibilities and dine together, their affiliation with one another would be no different than if they were fellow residents of a boarding house.

*Id.* at 200, 491 A.2d 17.

The instant case, by contrast, does not involve a halfway house. *See* Molloy Aff., ¶ 7, Plt.App. 11 (discussing differences between halfway house and Oxford Houses). The residents share more than "household responsibilities" and meals. The residents make all house decisions in a democratic fashion. But even more importantly, the support they lend each other is therapeutic, in the same manner as that of a well-functioning family. The relationship between the resident-plaintiffs herein is not analogous to that between residents of a boarding house.

Moreover, the court finds the New Jersey Supreme Court's recent ruling in *Glassboro v. Vallorosi,* 117 N.J. 421, 568 A.2d 888 (1990), controlling authority.[5] In that case, the Court held that a group of ten unrelated male college students were a "family" within the meaning of the borough ordinance limiting use and occupancy of dwellings to families only. The lower court had denied the Borough's application

---

5. The court notes that the case of *Open Doors* was decided before the Federal Fair Housing Act Amendments in 1988. The New Jersey Supreme Court in *Glassboro,* decided in 1990, also did not consider the Act.

for an injunction against the property owners, and the appellate court and Supreme Court affirmed. The ordinance at issue in that case was essentially the same as the ordinance at issue in the instant suit; the ordinance defined "family" as

> one or more persons occupying a dwelling unit as a single non-profit housekeeping unit, who are living together as a stable and permanent living unit, being a traditional family unit or the functional equivalency (sic) thereof.

*Id.* at 423, 568 A.2d 888, *citing* Glassboro, N.J., Code § 107–3 (1986). The Court found that the students' living arrangement fell into the category of family:

> The house had one large kitchen, which was shared by all ten students. The students often ate meals together in small groups, cooked for each other, and generally shared the household chores, grocery shopping and yard work. A common checking account paid for food and other bills. They shared the use of a telephone. Although uncertain of living arrangements after graduation, the students intended to remain tenants as long as they were enrolled at Glassboro State College.

*Id.* at 424, 568 A.2d 888. *See also id.* at 432, 568 A.2d 888. The court further relied on testimony of the students that "they do not just rent a room, but that they rent the whole house." *Id.* at 425, 568 A.2d 888, *citing Borough of Glassboro v. Vallorosi,* 221 N.J.Super. 610, 619, 535 A.2d 544. During the pendency of the appeal, Peter Vallorosi withdrew from Glassboro State College and the use of the home by the other students ended.

The *Glassboro* Court noted that courts of New Jersey have "consistently invalidated zoning ordinances intended to 'cure or prevent ... anti-social conduct in dwelling places.'" *Id.* at 426, 568 A.2d 888, *citing Kirsch Holding Co. v. Borough of Manasquan,* 59 N.J. 241, 281 A.2d 513 (1971). The municipal power to adopt zoning regu-

lations must be reasonably exercised, the Court continued; the regulations may not be unreasonable, arbitrary, or capricious. *Id.* The means chosen must have a real and substantial relation to the end sought to be achieved, and must be reasonably designed to resolve the problem without imposing unnecessary and excessive restrictions on the use of private property. *Id., citing Berger v. State,* 71 N.J. 206, 364 A.2d 993 (1976).

The Court relied on its prior ruling in *Kirsch,* in which it had invalidated ordinances in two shore communities that restrictively defined "family" and prohibited seasonal rentals by unrelated persons. *See Glassboro,* 117 N.J. at 426, 568 A.2d 888, and cases cited at *id.,* 426–31, 568 A.2d 888, including *Pemberton v. State,* 178 N.J.Super. 346, 429 A.2d 360, (App.Div.1981), *cert. den.,* 87 N.J. 364, 434 A.2d 1053 (1981) (upholding use of residence as group home for six to eight boys with a contemplated residency period of approximately six months). The Court referred to the case of *Open Door,* and did not disapprove of the court's ruling therein.

A similar situation to that in *Glassboro* is involved in the instant case. The plaintiff-residents share meals and household chores, and also support each other in their therapeutic recovery efforts. Moreover, while some of the residents may experience relapse and depart early, their intention is to remain together for a substantial length of time. *See, e.g.,* Tierney Aff. ¶ 8, Plt. App. 117 (planned to stay full year, but departed early due to financial stress of house); Molloy Aff. ¶¶ 30–31, Plt.App. 9–10 (resident can stay for lifetime; average stay at Oxford House–Northampton has been 4.6 years).[6] Accordingly, this case appears to fall squarely within the New Jersey Supreme Court's ruling in *Glassboro.*

The court's finding in *Open Door* does not contradict that of the Court in *Glassboro.* The same legal principles simply

---

**6.** The court also notes the holding in *Village of Belle Terre v. Boraas,* 416 U.S. 1, 7, 94 S.Ct. 1536, 1540, 39 L.Ed.2d 797 (1974), wherein the Supreme Court upheld a zoning ordinance that, the Court found, was "not aimed at transients."

*Id.* at 7, 94 S.Ct. at 1540. Accordingly, while the court does not reach this issue here, the focus of the Plainfield zoning ordinance and of the decision of the Board of Adjustment in the instant matter on "permanence" may be misplaced.

found different application to the facts in each case. Even if this court or the state court were to find, after a full hearing, that OH–E does not have the characteristics of a "family," such a result would represent the application of law to fact. The court will not, then, abstain because of "unsettled" New Jersey law on the subject, as the first prong of the *Pullman* abstention doctrine would require. *See Heritage Farms, Inc. v. Solebury Tp.*, 671 F.2d 743 (3d Cir.1982), *cert. den.*, 456 U.S. 990, 102 S.Ct. 2270, 73 L.Ed.2d 1285 (1982) (*Pullman* abstention does not apply where state law involved is settled, and *Burford* abstention does not apply where state land use policies are not being attacked, but rather, alleged illegal application of those policies in a single township).[7]

Even if New Jersey law were considered unsettled in this area, however, the case before this court, *Oxford III*, may not turn on New Jersey law. Plaintiffs' claims of intentional discrimination in violation of the Fair Housing Act and the United States Constitution, based on singling plaintiffs out for zoning enforcement action, may remain whether or not defendants' actions are justified under state law. *New–Jersey Philadelphia Presbytery of the Bible–Presbyterian Church v. New Jersey State Board of Higher Education*, 654 F.2d 868, 881 (3d Cir.1981); *Woods–Drake v. Lundy*, 667 F.2d 1198, 1202 (5th Cir.1982); *Fralin & Waldron, Inc. v. County of Henrico*, 474 F.Supp. 1315, 1319 (E.D.Va.1979) (issues as to state land use policies will be presented, but sole question for federal court is whether, "whatever permissible land use factors *could have been* considered, a discriminatory purpose *was in fact* the principal consideration motivating the defendants to take the actions they did").

The second requirement of the *Pullman* abstention doctrine may be met in this case. The state court hearing scheduled for September 3, 1991, could resolve the issues in plaintiffs' favor, and obviate the need for any further ruling on statutory or constitutional grounds. Moreover, as to the third requirement, an erroneous federal court decision on state law grounds could disrupt the important state policies involved in zoning ordinances. However, in light of the court's ruling on the absence of the conditions necessary to meet the first requirement of *Pullman* abstention, the court will decline to abstain on this ground.[8]

Finally, plaintiffs argue that *Pullman* abstention applies only where constitutional issues are brought in state court, and herein their main ground for challenging the City's alleged violations are not constitutional, but statutory FHA violations. Given the court's conclusions as to plaintiffs' likelihood of success on the merits of the statutory claims, *see infra*, the court is unlikely to reach the constitutional issues in this case. Plaintiffs may, then, be correct in their argument that *Pullman* abstention may not be appropriate. The court notes that in *Glassboro* the New Jersey Supreme Court declined to rule on the constitutional challenge to the zoning ordinance, because of its finding that the residents met the criteria for "family" under that ordinance. 117 N.J. at 432, 568 A.2d 888.

### B. *Younger abstention*

■ The court next considers whether *Younger* abstention is appropriate in this case. *Younger* abstention has been extended to apply to state civil proceedings. *See Williams v. Red Bank Bd. of Ed.*, 662 F.2d 1008, 1013–14 (3d Cir.1981). The following three-pronged test is applied for determining whether a federal court should abstain when state judicial proceedings are pending: There must be an ongoing state

---

7. Judge Menza, relying on *Open Door*, found that New Jersey law on the issues raised is "not unsettled." July 31, 1990 Hearing Tr. at 9, Plt. App. 66. The court relied only on *Open Door*, and did not refer to *Glassboro*, which was decided six months prior to the hearing.

8. Because of the court's holding, the court will not consider the additional equitable factors outlined in *Hughes*, 906 F.2d at 964–67 (whether an adequate state remedy is available, whether the federal action has been unduly delayed, the impact in seeking a delay in the state court ruling, and comity).

proceeding, the proceeding must implicate important state interests, and there must be an opportunity in the state proceeding to raise the federal claims. *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 431–32, 102 S.Ct. 2515, 2520–21, 73 L.Ed.2d 116 (1982). The first two prongs are met here, but the third raises some question. Plaintiffs claim that the state court in its first hearing declined to consider the issues raised under the Fair Housing Act. Plt. Brief at 47, *citing* Plt. App. 56–57. Plaintiffs further maintain that the Zoning Board refused to consider the applicability of the Federal Fair Housing Act Amendments to this case, despite the state court's instruction that it should.[9]

 Moreover, there are a number of exceptions to the *Younger* abstention doctrine. First, where bad faith or harassment is exhibited by state officials, *Younger* abstention does not apply. *Younger,* 401 U.S. at 53, 91 S.Ct. at 755. Plaintiffs allege just such harassment. Complaint ¶¶ 30, 65. The various incidents attendant this matter, including vociferous neighborhood opposition, the subsequent revocation of the "permitted use" ruling by the Zoning Officer, the statements made by the City Council and the Mayor,[10] and the number of housing code inspectors that have been sent to the premises of OH–E, suggest that such harassment may ultimately be found.

Second, the parties in the state court proceedings are not the same as those in the instant action. *See Sullivan v. Pittsburgh,* 811 F.2d 171, 177 (3d Cir.1987), *cert. den.,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987), *citing Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). OH–E and the individual resident-plaintiffs are not involved in the state court action, and OHI cannot fully represent their interests. OHI, as plaintiff in the state proceeding, cannot obtain damages for the resident-plaintiffs. In addition, the Third Circuit has rejected the argument that because parties to the federal court action could have intervened in the state court proceeding, the federal court should abstain. *Sullivan,* 811 F.2d at 178 n. 7. Moreover, should OHI decide to end the litigation, the residents will have no recourse through the state proceeding.

Nor are the parties herein and in the state proceeding closely enough related "in terms of ownership, control, and management," *Doran,* 422 U.S. at 929, 95 S.Ct. at 2566, so as to be given unitary treatment under *Hicks v. Miranda,* 422 U.S. 332, 348–49, 95 S.Ct. 2281, 2291–92, 45 L.Ed.2d 223 (1975). OH–E is financially independent from OHI. While OH–E must operate in ac·ordance with the "concept, system of operations and traditions of Oxford House," Plt.App. 59, and financial reports of OH–E must be sent to OHI headquarters, Plt.App. 90, the relationship appears to be one of consultation, and perhaps distant supervision, rather than one of control and management.[11]

This case is analogous to *Sullivan,* 811 F.2d at 177–78. In that case, the Third Circuit upheld the district court's grant of an injunction enjoining the City of Pittsburgh from closing an alcoholic treatment center, and requiring it to issue conditional

---

**9.** *See* Zoning Board hearing, August 21, 1990, Tr. at 258–59; and Judge Menza's Order of referral of the matter to the Board, at Plt.App. 57.

It is also unclear whether Judge Menza intends to rule on the merits of plaintiffs' FHA claims in his September hearing. The pre-trial order asks for briefing on the claims. *See* Def. Exh. R. However, at oral argument plaintiffs stated that Judge Menza could only rule on the FHA in "an evidentiary vacuum," having decided that further evidentiary submissions on those claims were unnecessary. Defendants maintained at oral argument that Judge Menza was "aware" of the FHA issues, but had not made any determination on them.

**10.** *See, e.g.,* Plt.App. at 37 (City Administrator Gibson was quoted as noting that City was "unwilling to embrace such a program"); Plt.App. at 52 (the Mayor "made a decision—no more homes of any kind. If you don't want it, that's all.").

**11.** Defendants argue that OH–E, an "unincorporated association," is a facade for the plaintiff-residents. However, that is an argument for giving OH–E and its residents unitary treatment, not for considering OHI and OH–E as unitary. The identity and interests of OH–E may in fact be distinct from those of its residents, but the court need not address that issue here.

use permits to the facility. The Court rejected the argument that the district court should have abstained under *Younger*, in part on the basis of the distinct identities between the parties in the state administrative proceeding and in the federal action. The Court concluded that "[c]lass action-plaintiffs appellees have no proprietary interest in ARC [the treatment facility], and ARC does not employee appellees." *Id.* at 178 (citations omitted).

Third, a *Younger* exception is met in this case due to the specter of irreparable injury that could befall the plaintiffs if this court fails to exercise jurisdiction. *See Sullivan*, 811 F.2d at 179, *citing Kugler v. Helfant*, 421 U.S. 117, 124–25, 95 S.Ct. 1524, 1530–31, 44 L.Ed.2d 15 (1975); *Mitchum v. Foster*, 407 U.S. 225, 242, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972) ("federal injunctive relief against a state court proceeding can in some circumstances be essential to prevent great, immediate, and irreparable loss of a person's constitutional rights").

Plaintiffs have submitted affidavits establishing the financially precarious situation of OH–E at this time. Affidavits of Valentine, Plt.App. 110–112, and Tierney, Plt.App. 117. The plaintiff-residents cannot afford to continue rent and utility payments with only six individuals in the house. The plaintiffs are currently almost $4,000, or two and one half months, behind in their rent. Weiner Aff. ¶ 14, Plt.App. 5. Moreover, they allege that their therapy suffers by the limited number of residents. *See* Molloy Aff. ¶ 29, Plt.App. 19; Valentine Aff. ¶ 15, Plt.App. 112. Plaintiff Weiner, the owner of the premises, has stated that she cannot maintain the house in its current financial state, and will have to evict the plaintiff-residents if this court denies the relief requested. Weiner Supplemental Certification ¶ 7 (July 25, 1991).

While these arguments were raised and rejected before Judge Menza and the appellate New Jersey courts, the situation seems to have progressively deteriorated since the time of those appeals. Moreover, this court must take the allegations in the certifications and affidavits that plaintiffs have presented as true; if true, it appears that plaintiff-residents' eviction is imminent, and that such eviction is very likely to cause them irreparable injury.

Defendants argue that the state court restraints simply maintained the status quo in the matter. However, if the plaintiff-residents are evicted from OH–E as a result of the restraints, the status quo will not have been preserved.[12] Defendants further argue that plaintiffs' delay of seven months from the denial of their appeal to the New Jersey Supreme Court for relief from the temporary restraints imposed, points to a lack of impending irreparable injury. *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F.Supp. 602, 609 (S.D.N.Y.1979) (delay calls into question the imminence of the irreparable injury claimed). The court rejects this argument on the facts of this case. The court could draw the inference from plaintiffs' two appeals to Judge Menza, and then to the appellate division and the New Jersey Supreme Court, that its situation was urgent in 1990. Plaintiffs' financial situation appears to have further deteriorated over the course of this year, due to the continued restriction on the number of residents in the house.

In addition to losing their residence, which may in itself be an irreparable injury, *see Sampson v. Murray*, 415 U.S. 61, 101, 94 S.Ct. 937, 958, 39 L.Ed.2d 166 (1974) (Marshall, J., dissenting); *cf. Lancor v. Lebanon Housing Authority*, 760 F.2d 361, 363 (1st Cir.1985), plaintiffs would also lose the benefit of their therapeutic and

---

**12.** Defendants claim that the state court's continuance of its earlier-imposed restraints was made pursuant to N.J.S.A. 40:55D–75, which provides for the preservation of the status quo pending an appeal to the Board of Adjustment. Rather, that statute provides for a "stay of all proceedings," pursuant to an appeal to the Board of Adjustment. Moreover, even if a "stay" were understood to encompass the type of temporary restraints involved in this matter, the statute provides an exception where a stay would cause "imminent peril to life or property." *Id.*

supportive living environment, and may relapse. Regan Aff., ¶ 18, Plt.App. 27.

This situation is similar to that in *Sullivan*, where recovering alcoholics were in danger of losing their treatment facility. There the court held that "[i]ndeed, it is difficult to conceive of many facts which would more compellingly argue for appellants' relief." 811 F.2d at 180. Defendants would have the court distinguish this case from *Sullivan*, arguing that in that case the facility threatened with closure was an alcoholic treatment center, and not a unit functioning as a family, as is alleged by plaintiffs to be the case with OH–E. Def. Brief at 27. The court rejects defendants' proposed distinction. For a nonhandicapped individual, the disintegration of a family unit is traumatic; for recovering alcoholics and drug addicts, it may be devastating.

### C. *Burford abstention*

■ Finally, the court will consider whether the doctrine of *Burford* abstention applies. *Burford* abstention is warranted where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River*, 424 U.S. at 814, 96 S.Ct. at 1245.

■ Pursuant to this court's prior ruling, that the state law in this area is not "unsettled," the court declines to hold that *Burford* abstention is required in the instant case. The New Jersey Supreme Court in *Glassboro* made it clear that it would accept zoning ordinances defined around the concept of a family as a single housekeeping unit. 117 N.J. at 428, 568 A.2d 888. The instant case involves the application of that law to the facts, pursuant to the state's "coherent policy," and the further issue of whether the application by

the Zoning Officer and Board was violative of the Fair Housing Act.

Indeed, abstention has been held particularly inappropriate in civil rights cases. *Sullivan*, 811 F.2d at 179, *citing Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977);[13] *United States v. Black Jack, Mo.*, 508 F.2d 1179, 1184 (8th Cir.1974), *cert. den.*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *United States of America v. Commonwealth of Puerto Rico*, 764 F.Supp. 220, 226 (D.P.R.1991), (Plt.App. 164, at 177), *citing Association of Relatives & Friends of AIDS Patients ["AFAPS"] v. Regulations & Permits Admin.*, 740 F.Supp. 95, 102 (D.P.R.1990); *Fralin*, 474 F.Supp. at 1319 (refusing to apply *Burford* abstention in a civil rights suit challenging zoning action). The *Burford* case itself was a diversity action, which did not involve any major federal involvement. 319 U.S. at 317–19, 63 S.Ct. at 1098–1100. Finally, the court notes that § 816 of the FHA provides that "any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall be to that extent invalid."

### D. *Judicial Economy*

■ Aside from these abstention doctrines, *Colorado River* dictates that abstention may also be appropriate in the interests of conserving judicial resources and avoiding duplicative litigation. 424 U.S. at 817–20, 96 S.Ct. at 1246–48.

Indeed, the continuing state court proceedings were filed before the instant one, and have progressed considerably. However, the interests of judicial economy are outweighed in a case such as this, which involves allegations of violations of civil and constitutional rights. Furthermore, the court's limited action herein, *see infra*, merely preserves plaintiffs' cause of action pending the state court hearing, while sparing plaintiffs irreparable harm.

---

**13.** Defendants argue that *Sullivan* is inapposite, reasoning that in that case, relief was unavailable in state court because the statute of limitations had expired. Def. Brief at 25 * *. However, the Court in *Sullivan* cited *Wooley* for the

broader proposition for which *Sullivan* is cited here. The Court held that federal equitable relief is justified upon a showing that " 'an injunction is necessary in order to afford adequate protection of constitutional rights.' "

## II. Motion for Preliminary Injunction

Having declined to abstain in this matter, the court turns to a determination of plaintiffs' motion for a preliminary injunction, in which plaintiffs ask this court to stay or vacate the state court's imposition of temporary restraints and enjoin defendants from interfering with plaintiffs' continued occupancy and use of OH–E.

### A. Anti–Injunction Act

■ The first issue to consider is whether the Anti–Injunction Act, 28 U.S.C. § 2283, bars the relief sought. The statute provides that a federal court "may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." *Id.* Defendants argue that this Act operates as a bar to the granting of the relief requested by plaintiffs herein.

However, the requested relief in this preliminary injunction motion does not amount to a "stay" of the state court proceeding. The Third Circuit in *U.S. Steel Corp. Plan for Employee Insurance Benefits v. Musisko*, 885 F.2d 1170 (3d Cir.1989), *cert. den.*, —— U.S. ——, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990), held that a district court's order constituted an inappropriate stay of a state court's proceeding where the district court restrained a state court from ruling on a dispute over employee benefits "under any law other than ERISA." *Id.* at 1173. Plaintiffs argue that no such "intrusive action" is requested here. Reply Brief at 2. While this court's granting of the preliminary relief sought by plaintiffs would "interfere" with the state court's imposition of temporary restraints, it would not affect the proceedings or final decision of that court. *See New–Jersey Philadelphia Presbytery*, 654 F.2d at 879 (injunction restraining defendant from availing itself of portion of preliminary relief the state court had granted did not interfere with the state court proceedings; declining to apply *Younger* ).

Moreover,, the court concludes that this matter falls within the "expressly authorized by Congress" exception under the Act. *See Mitchum*, 407 U.S. 225, 92 S.Ct. 2151. The court relies on the discussion by the court in *Casa Marie, Inc. v. Superior Court of Puerto Rico for Dist. of Arecibo*, 752 F.Supp. 1152, 1169 (D.P.R.1990).[14] Defendants argue that the text of the FHA does not indicate that Congress intended to authorize federal courts to grant injunctions against state courts. Defendants also note that the FHA provides for concurrent jurisdiction between state and federal courts. § 3613(a)(1)(A). However, the legislative history, as analyzed by the court in *Casa Marie*, shows that Congress intended to enact a broad federal remedy to housing discrimination.

### B. Preliminary Injunction Factors

■ To grant a preliminary injunction, the court must find that four factors are satisfied: Plaintiff has a likelihood of success on the merits of her claim; plaintiff is subject to irreparable harm *pendent lite*, if the temporary restraints do not issue; defendant will not suffer substantial harm from the grant of an injunction; and the public interest requires the relief to be granted. *Sullivan*, 811 F.2d at 181. The court considers each of these factors in turn.

#### i. Likelihood of Success

Plaintiffs have brought claims under §§ 804 and 818 of the federal Fair Housing Act, as amended in 1988. 42 U.S.C. §§ 3604(f)(1) and 3617 (Supp.1989). Section 3604(f)(1) provides that it is unlawful to

---

**14.** The *Mitchum* Court set forth the following guidelines for determining whether the "expressly authorized" exception applies: No "prescribed formula" is required—a statute need not expressly refer to § 2283, nor must a federal law expressly authorize an injunction of a state court proceeding. Rather, an "Act of Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding." *Mitchum*, 407 U.S. at 237, 92 S.Ct. at 2159. As the court in *Casa Marie* found, these requirements are met by the FHA.

discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter;

(B) a person residing in or intending to reside in that dwelling after it is so sold, or made available; or

(C) any person associated with that buyer or renter.

That provision also makes it unlawful discrimination, for the purposes of the subsection, to "refus[e] to make reasonable accommodations in rules, policies, practices, or services, when such accommodation must be necessary to afford such person equal opportunity to use and enjoy a dwelling." § 3604(f)(3)(B). Section 3617 provides that it

> shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encourage any other person in the exercise or enjoyment of, any right guaranteed or protected by section ... 3604....

In order to prove its claim of a violation of the Fair Housing Act, plaintiffs have to show, first, that the plaintiff-residents are "handicapped" within the meaning of the Act, and therefore fall within its protection. The Act defines "handicap" as (1) a physical or mental impairment which substantially limits one or more of a person's major life activities; (2) a record of having such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 3602(h). The statute goes on to note that "such term does not include current, illegal use of or addiction to a controlled substance...." *Id.* The legislative history of the Act's Amendments indicates that recovering alcoholics and addicts were meant to be included in the definition. H.R.Rep. 711, 100th Cong., 2d Sess. 22 (1988); U.S.Code Cong. & Admin.News 1988, pp.

2173, 2183; *see also* 24 C.F.R. § 100.-201(a)(2) (1989); *Sullivan,* 811 F.2d at 182 (alcoholics are handicapped within the meaning of § 504 of the Rehabilitation Act).

Defendants argue that plaintiff-residents cannot be considered "handicapped" within the meaning of the Act, and that they fall outside of the protection of the Act, because they may be current users of illegal drugs, 42 U.S.C. § 3602(h), have a prior criminal conviction for the distribution or sale of drugs, § 3607(b)(4), or constitute a direct threat to the health or safety of the neighborhood or property of others, § 3604(f)(9). Defendants argue that there are questions of fact as to these issues.

While the court does not dispute defendants' argument that whether plaintiffs fall into one of these three categories may present a question of fact for trial, defendants have given no indication that the plaintiff-residents do in fact fall into any of these categories. Defendants note that 13 of the 20 persons admitted to OH–E as of April, 1991, have left. Of those 13, 9 have left due to a relapse. Def.Exh. Q. Plaintiffs argue that the number of relapses at OH–E is the highest of any Oxford House in New Jersey, and postulate that the high number is due to the stress that the pending litigation and the neighborhood opposition place on the residents. Plaintiffs' Reply Brief, at 12–13 n. 4; *see also* Tierney Aff. ¶ 8, Plt.App. 117. In any event, defendants' citations to these figures do not establish that the residents are "current users of illegal drugs." The House rules mandate that no resident can use drugs and remain in the House.[15]

With regard to the second exception, defendants argue that given who the residents are, a conviction of the type included in § 3607(b)(4) "would not be unlikely." Def. Brief in Opp. at 16. The court finds such speculation insufficient to establish that plaintiff-residents are not "handi-

---

**15.** Defendants argue that plaintiffs have not established that plaintiff-residents do not fall into one of these three exceptions to the characterization of individuals as handicapped under the Act. However, defendants have cited no authority for the proposition that it is plaintiffs' burden to establish that the residents do not fall into any of these three, or indeed any of the exceptions under the Act.

capped," [16] or even to create a sufficient question of fact so as to bar the court's award of the requested relief. *See* Fed. R.Civ.P. 52(a); *Charles Simkin & Sons, Inc. v. Massiah,* 289 F.2d 26, 29 (3d Cir. 1961) (issue of fact precludes an interlocutory injunction).

With regard to the third category, wherein individuals who pose a threat to health, safety, or property are not to be considered "handicapped" under the Act, defendants have pointed to no evidence that the category applies to plaintiff-residents, but only can point to the speculative conclusions of the neighbors. "Generalized assumption, subjective fears, and speculation are insufficient to prove the requisite direct threat to others." H.R.Rep. No. 711, at 29, U.S.Code Cong. & Admin.News 1988, p. 2190. Defendants have provided affidavits of neighbors of OH–E that assert that incidents of vandalism have increased in the neighborhood since the residents of OH–E have moved in, *see* Mahdi Certif., Negley Certif., and Monroe Certif., but they have offered nothing to substantiate these assertions, nor any evidence tending to link the plaintiff-residents with these alleged incidents.[17]

Next, to prove a FHA violation, plaintiff must show either intentional discrimination or a discriminatory impact. The evidence that has been brought to light at this preliminary stage of the litigation points to plaintiffs' likelihood of success on this point as well.

As to intentional discrimination, the minutes of the City Council meeting show that the fact that the intended occupants of OH–E were recovering addicts was a motivating factor in their decision. Plt.App. 35–46.[18] *See Woods–Drake,* 667 F.2d at 1202 and *Casa Marie,* 752 F.Supp. at 1168 (under Fair Housing Act plaintiff must show that discrimination was in some part the basis for the action, but does not need to show discrimination was sole motivating factor). The Mayor's comments indicate concurrence with this, the popular view in the neighborhood and on the City Council. Plt.App. 52. While the City's legitimate interest in maintaining zoning for single-family homes and enforcing its zoning ordinances is not in question, defendants' citation to these interests as the sole underlying motive of the City in the instant case is questionable. Given the sequence of events in this case, the declared motives suggest the possible operation of a pretext for discrimination.[19] Most notably, Zoning Officer Pringley first announced that OH–E represented a permitted use under the applicable zoning ordinance, and then reversed her determination after the City Council meeting of May, 1991, at which much neighborhood and City Council opposition was expressed.

The City's actions also have a discriminatory impact on the plaintiff-residents. Under the "disparate impact" test, the court must examine the strength of plaintiff's showing of discriminatory effect; whether there is some evidence of discriminatory intent; defendant's professed interest in taking the action complained of; and whether the plaintiff seeks to compel the defendant to affirmatively provide housing for members of a protected class or merely seeks to restrain the defendant from inter-

---

**16.** Indeed, the statement may be evidence of discriminatory intent.

**17.** Defendants also argue that plaintiffs themselves have stated that one of the residents stole a significant sum of money from the house. Plt.App. 117. While this incident may be attributable to one of the former residents of OH–E, the current resident-plaintiffs cannot be said to fall into the category of exceptions under the FHA definition of handicapped because of the actions of another, former resident.

**18.** For example, one of the residents stated that the "facility would have a deleterious effect on

[the] neighborhood," Plt.App. at 45; Counsel Williamson reported on a conversation he had with City Administrator Gibson in which Mr. Gibson stated that he understood that the Council was "unwilling to embrace such a program in the City." Plt.App. at 37.

**19.** Defendants' justifications for the zoning ordinance and its application could also be found "irrational" under the Fourteenth Amendment, as the reasons given for the denial of a special use permit for the operation of a group home for the mentally retarded were found to be in *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

fering with individual property owners wishing to provide such housing. *AFAPS*, 740 F.Supp. at 103. The plaintiff could prove discriminatory impact by showing a greater adverse impact on a protected group than on others, or by perpetuating an existing pattern of segregation in the community. *Metropolitan Housing Dev. Corp. v. Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir.1977), *cert. den.*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978). *See also Huntington Branch, NAACP v. Huntington*, 844 F.2d 926, 934 (2d Cir. 1988).

Plaintiffs herein have shown a likelihood of success in proving each of these elements. Recovering alcoholics and drug addicts may never be perceived as "stable" and "permanent" by communities that object to their presence. Given the City's actions and the rationale given for those actions, it is difficult to imagine how a recovering alcoholic or drug addict would be accepted, no matter what the precise living situation, in any neighborhood in the City of Plainfield. Moreover, if the exclusionary effect of the City's actions were upheld, and were duplicated state-wide, no Oxford Houses could exist in New Jersey. As the court in *Casa Marie* held, "the *effect* would be a broad scale exclusion of the . . . handicapped [group] as opposed to any other group of potential residents." 752 F.Supp. at 1169 (emphasis in original).

Defendants argue that the discriminatory impact, if any, is on the legitimate basis of permanence, and not on the basis of handicap. However, as indicated, the sequence of events in the record of this case suggest that this stated interest may prove to be a pretext for the underlying discrimination. *See Casa Marie*, 752 F.Supp. at 1169 (finding defendants' professed desire to stop the development of businesses in the community a pretext).[20] Defendants also argue that the municipality has a legitimate governmental interest in regulating land use, and no alternative would serve this interest with less discriminatory effect. As indicated, the court does not wish to

disturb this legitimate interest of defendants, but only to ensure that it is effected in a nondiscriminatory manner. Defendants' further argument that the City's actions do not operate to deny OH–E equal access "because there other locations in the City in which members would be permitted to establish a group home without infringing on any zoning ordinance," Def. Brief at 19, is without merit. Anti-discrimination laws are designed to prevent just such discriminatory segregation.

Thus, plaintiffs have shown a discriminatory effect, discriminatory intent, and the possibility of a pretext having been offered. Further, the instant case involves not a request to affirmatively compel defendants to provide housing for members of a protected class, but merely seeks to restrain defendants from interfering with the provision of such housing by individual property owners. Finally, if the alleged violation is allowed to continue, handicapped recovering alcoholics and drug addicts will be effectively segregated from non-handicapped individuals in their housing environment. Accordingly, the court concludes that plaintiffs have a likelihood of success of showing a violation through both discriminatory intent and impact.

In addition, plaintiffs have a likelihood of success on the merits under 42 U.S.C. § 3617 of showing "interference" by defendants with the residents' right to live in the neighborhood of their choice, with Ms. Weiner's contractual relations, and with OHI's efforts to provide a therapeutic environment for the recovery of the residents.

Finally, the United States, as *amicus*, has convincingly argued that plaintiffs have a substantial likelihood of establishing that defendants have violated the mandate of the FHA to "make reasonable accommodations" to house the handicapped. The accommodation that would be provided through the relief sought herein would be reasonable. Accommodating OH–E would not cause undue financial burden to the City, and in the twelve months that OH–E has been occupied by plaintiff-residents

**20.** *See also supra* n. 6 ("permanence" may be inappropriate basis for zoning ordinance).

there have been no documented disturbances.[21]

Because of the court's conclusion as to plaintiffs' likelihood of success on the merits in proving an FHA violation, it will not discuss the likelihood of plaintiffs' success on its claims under the Rehabilitation Act of 1973, the Equal Protection and Due Process Clauses of the United States and New Jersey Constitutions, the New Jersey Municipal Land Use Law and the New Jersey Law Against Discrimination.

### ii. Irreparable Injury

Plaintiffs also have shown irreparable injury, and thereby have met the second requirement for the grant of a preliminary injunction. As discussed above, the residents of the house do not have the financial resources to pay the monthly expenses of the house. Plaintiffs maintain that with the temporary restraints in place, the status quo is not preserved, but rather the plaintiff-residents will be forced to move out of OH–E. The court concluded, *supra*, that plaintiffs face irreparable injury from eviction, both due to loss of the house and loss of their supportive and stable living environment.

Plaintiffs argue that irreparable injury can be presumed from a finding of a violation of the FHA. Plaintiffs cite *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423–24 (11th Cir.1984), *cert. den.*, 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 187 (1984). Defendants, citing *Flynn v. United States*, 786 F.2d 586, 591 (3d Cir.1986); *Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc.*, 906 F.2d 934, 940 n. 6 (3d Cir.1990), dispute this, in light of the discretionary nature of the authorization to federal courts to grant injunctions under the FHA. Because the court finds irreparable injury, it need not reach this issue.

### iii. Harm to Defendants

The third factor to be considered by the court in ruling upon a motion for a preliminary injunction is whether defendants will suffer severe harm. The court concludes that defendants herein cannot claim that they will suffer severe harm from the lifting of the temporary restraints.

First, the injunctive relief sought would not require the expenditure of any resources by the City, but rather would save resources. The Third Circuit held in *Sullivan*, 811 F.2d at 183–84, that closing a treatment facility posed a great harm not just to its handicapped residents, but also to the surrounding community. The Court noted the benefits of allowing the treatment facility to continue, in reducing the burden posed on area police and fire departments.

Defendants have submitted affidavits setting forth complaints of the neighbors and the basis for their objections to the proposed use of OH–E. These complaints amount to speculation and subjective fears, and cannot be considered by this court in determining what harm defendants will suffer. Moreover, the Court in *Glassboro* held that "noise and other socially disruptive behavior are best regulated outside the framework of municipal zoning." 117 N.J. at 433, 568 A.2d 888. While the court does not dispute that defendants maintain an interest in "zones where family values, youth values, and the blessings of quiet seclusion and clear air make the area a sanctuary for people," *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974), the court concludes that in the instant case it is not clear that those interests are threatened. Moreover, the rights of the plaintiffs, as well as the public interest in vindicating those rights, outweigh this countervailing interest.

### iv. Public Interest

The public interest in the protection and enforcement of civil rights weighs in favor of this court's granting to plaintiffs the relief requested. Moreover, as noted

---

**21.** The neighbors of OH–E have certified that loud noises and other disturbances have been created by the residents; affidavits of OH–E residents and of Ms. Weiner state that no such disturbances have occurred. A police report has also been submitted to the court, reflecting neighbors' complaints. Exh. A of Mahdi Certif. However, the parties have not brought to the court's attention police actions having been filed.

above, the public has an interest in the recovery of alcoholics and drug addicts. The federal and state enactments prohibiting discrimination and promoting drug treatment, control, and enforcement, are a reflection of the public interests at stake. The court concludes that these interests outweigh the defendants' interests in enforcing the zoning ordinance against plaintiffs.

*Conclusion*

Plaintiffs ask this court to vacate or stay the restraints imposed by the New Jersey Superior Court, which limit the number of residents at OH–E to six and bars the use of the third floor of the house. The plaintiffs also ask this court to order the City to refrain from interfering with the house's continuation, pending the final outcome of the case. Plaintiffs note that this court may grant an injunction under the FHA, § 813(c), "including an order enjoining the defendant from engaging in [a discriminatory housing] practice or ordering such affirmative action as may be appropriate." Defendants have asked the court to dismiss or stay the complaint in this action.

For the foregoing reasons, the court will abstain in ruling in this action as to OHI. The court partially grants plaintiffs' motion for a preliminary injunction, insofar as the temporary restraints imposed by the state court shall be modified to allow a maximum of nine men to reside at Oxford House–Evergreen until the final resolution of the state court proceeding. The state court's determination barring the use of the third floor shall not be disturbed. Defendants' cross-motion to stay or dismiss this action is partially granted, insofar as this action shall be stayed until the final resolution of this matter in the state court proceeding.